No. 80-92

IN THE SUPREME COURT OF THE STATE OF MONTANA

1981

GORDON RASE, JIM WOODARD et al.,

Plaintiffs and Respondents,

vs.

CASTLE MOUNTAIN RANCH, INC.,

Defendants and Appellants.

Appeal from: District Court of the Third Judicial District,
In and for the County of Powell.
Honorable Peter Meloy, Judge presiding.

Counsel of Record:

For Appellants:

Gough, Shanahan, Johnson & Waterman, Helena, Montana
Ward Shanahan argued, Helena, Montana

For Respondents:

Poore, Roth, Robischon and Robinson, Butte, Montana
James Poore argued and Urban Roth argued, Butte,
Montana

Submitted: March 26, 1981

Decided: JUL 2 - 1981

Filed: JUL 2 - 1981

Thomas J. Kearney
_____
Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

Both sides appeal from a judgment entered by the Third Judicial District Court, Powell County, imposing a constructive trust for more than 40 cabin sites at Rock Creek Lake in Powell County, on real property now owned by Castle Mountain Ranch, Inc., successor to Ward Paper Box Company (Ward).

The cabin sites which surround Rock Creek Lake about 15 or 20 miles from Deer Lodge, Montana, were owned until 1972 by Rock Creek Irrigation, Inc., a subsidiary of Williams and Tavenner, Inc. (Tavenner), which operated the surrounding ranch. In 1972, Tavenner sold the ranch, including the lakeshore property, to Ward Paper Box Co. The ranch has since been transferred to Castle Mountain Ranch, Inc. Louis Ward is the principal shareholder or owner in both corporations and was the primary actor in the purchase of the ranch, including the cabin sites around Rock Creek Lake.

The respondents and cross-appellants here (plaintiffs in the District Court) are owners of summer homes and cabins around the lake. They and their predecessors, acting individually, at various times since 1922, built and improved summer homes, some quite substantial, on the Rock Creek Lake front, on real property owned by Tavenner, and with the consent and permission of Tavenner. The issue for us to decide, as in the District Court, is the nature and extent of any agreement between the cabin owners and Tavenner, individually or collectively, express or implied, for termination of the permission.

The cabins were built around the lake over a course of many years, by friends, neighbors and employees of the ranch owners, with their consent and possibly with their implied

-2-

invitation. These were permanent structures, sometimes built with timber from the ranch and sometimes with the assistance of the ranch owners. The ranch owners owned one of the cabins. Reasons given for the ranch owners extending permission include the wish for companionship at the ranch, the help of the cabin owners in protecting the ranch properties, their availability for fire lookout and fire fighting, and their help in maintaining the roads, as well as their friendship and society.

For at least 50 years, relations between the cabin owners and the ranch owners were amicable. The cabins were inherited, bought and sold without interference from the ranch owners. Cabins were expanded and renovated, and the ranch owners were advised of sales or inheritance of the cabins, sometimes after the fact. Through the years, the cabins were modernized, expanded and improved. The ranch owners were aware of the continuing maintenance of the summer homes. County records, at the time of trial, indicated that the summer cabins had an assessed value of $300,000. The ranch owners did insist on permanent structures to be located on the cabin sites; no trailers or movable homes were permitted.

On some occasions, various cabin owners attempted to purchase the underlying cabin sites, but the ranch owners advised that the lake provided water for the ranch, and the ranch owners wanted to maintain control over the lake itself. The use of the lake for irrigation did not interfere with the owners' use of their cabins.

In the very earliest years, no documents were entered into between the ranch owners and cabin owners. After some period of time, some of the cabin owners entered into lease

-3-

agreements with the ranch owners, but these agreements expired by their own terms. Starting in 1963, however, the cabin owners signed documents that were entitled "license agreements." These documents had been drafted by the lawyer for the ranch owners. All of the license agreements had the same general provisions, and essentially provided as follows:

1. A license from Rock Creek Irrigation, Inc. to the cabin owner for the use of the cabin site together with right of access thereto.

2. A term for the license, solely for a summer camp or cabin site, beginning January 1, 1963 and ending on termination.

3. A fee for $6.00 per year payable in advance or 50 cents per month for any part of a year on or before January 1 of each year.

4. A provision for the erection of structures on the cabin site by the licensee, to be approved in advance by the licensor, and providing that such structures should be removed by the licensee at termination, or the structures became the property of the licensor.

5. A provision making the licensee liable for damages to the crops, timber, fences and improvements of the licensor.

6. A save harmless provision for the licensor.

7. A termination provision which is the heart of this lawsuit and which provided:

"Either party may terminate this agreement at any time, without regard to payment periods, by written notice to the other specifying the date of termination, which notice shall be given not less than thirty (30) days prior to the termination date therein specified . . ."

8. A provision that the relationship of landlord and tenant was not created between the parties, and that the license is personal to the licensee and not transferable to administrators, executors, successors or assigns of the licensee.

9. A provision for written notice by certified mail.

Tavenner did not ever serve a notice of termination upon any of the cabin owners. In the years from 1963 to

1972, the provisions of the license agreement were breached in many respects by various owners, without objection from Rock Creek Irrigation, Inc. Particularly, the cabins were bought and sold or transferred by inheritance without objection from the licensor.

Robert Tavenner testified, however, that the reason there were no terminations was "we had no thought of selling the ranch." He further said they had no reason to terminate the permissions, but "we wanted to be in a position to terminate if we had to."

It was probably assumed by all parties that the ownership of the ranch property would remain unchanged through the years. However, in 1969, on the death of one of the ranch owners, the position of the ranch owners changed, and the ranch property became available for sale. In 1972, Ward Paper Box Company entered the picture in the person of Louis Ward, its chief officer. He visited the ranch in the spring or early summer of 1972, and on July 21, 1972, his company (Ward) entered into a contract to purchase the ranch including the land surrounding Rock Creek Lake. The contract provided for a closing date of December 1, 1972. Attached to the contract for sale was a schedule of the license agreements which included the notation "consent of licensees to assignment not required."

Robert Tavenner, one of the ranch owners, testified that near the end of the negotiations, Louis Ward requested that Tavenner terminate the cabin owners. Tavenner refused. He testified:

> "Q. Now as a matter of fact if that had been made a condition of the sale you wouldn't have gone through with the sale? A. We wouldn't have gone through, we told him that. If that had been we wouldn't have gone through.

"Q. So, basically he took the sale and lake as it was, isn't that right? A. After I told him that we had a family conference, he said let me have a little time to think about it. And a day or two went by and he said he would take the ranch as planned, the cabins and all."

On October 13, 1972, counsel for Ward mailed a letter to all cabin owners advising that the impending transfer of ranch property would be consummated on December 1, 1972, and which letter included the following paragraph:

"We are writing on behalf of Ward Paper Box Company to advise you of this impending transfer and also to advise you that the purchaser has examined your license agreement and will construe it according to its literal terms. There have been no oral representations made to anyone with respect to the purchasers' intentions as to this property. You should therefore not assume that you have any rights or privileges other than those arising from your license agreement."

The transfer of the ranch property occurred according to schedule and on July 11, 1973, the new owners sent each of the cabin owners a notice of termination of their licenses. On December 20, 1973, the cabin owners filed their action in the District Court for interlocutory and permanent injunctive relief, and to quiet the title in their cabins and establish permanent easements thereto. The litigation limped along through various motions, hearings, discovery and briefing schedules until November 13, 1979, when the District Court entered its findings of fact, opinion, conclusions of law judgment and decree.. After post-trial motions by both parties, the court issued its final order of January 15, 1980. Timely notice of appeal was filed by Ward, and the cabin owners thereafter cross-appealed.

THE APPEAL

Ward raises essentially the following issues:

1. The District Court erred in specified findings of fact made, and in refusing offered findings from Ward.

-6-

2. The evidence does not support the District Court's decision.

3. The District Court decree violates the statute of frauds and the parol evidence rule, and disregards waiver by the cabin owners in signing the license agreements.

4. Ward was a bona fide purchaser without notice.

5. The court erred in imposing an equitable lien on the Ward properties.

These are proceedings of an equitable nature. Under section 3-2-204(5), MCA, our duty is to review all questions of fact arising upon the evidence presented in the record, whether presented by specifications of error or not and to determine the same as well as questions of law. Rule 52(a), M.R.Civ.P., requires findings of fact made by the District Court to be upheld unless they are clearly erroneous. Rule 52(a), does not make any distinction between causes of an equitable nature and cases at law, as far as the appellate review of the District Court findings of fact is concerned. We have stated in other cases that in appeals of equity causes, we will review both questions of law and questions of fact, but we will not reverse the trial court in an equity case on questions of fact unless there is a decided preponderance of the evidence against the findings of the trial court. Boz-Lew Builders v. Smith (1977), 174 Mont. 448, 452, 571 P.2d 389, 391; Barrett v. Zenosek (1957), 132 Mont. 229, 315 P.2d 1001. However broad those statements may appear, they should not be taken to mean that this Court will dodge the statutory duty fastened on it to make an independent review of questions of fact in equity cases. We cannot shirk the statutory duty. Rather, the statements should be taken to mean that in equity cases, where the issues are close, as they are here, a degree of deference will

-7-

be accorded the findings of the trial court since it is in a better position to make decisions of fact. Such statements are merely a reflection of the long-standing reluctance of appellate tribunals merely to substitute their judgment for that of the trial court in close issues of fact.

The findings of fact of the District Court to which Ward objects are the essential findings upon which the decision of the District Court is based. In essence, those findings include: that Tavenner did not intend to cancel the cabin site arrangements while it owned the ranch; that although there were no express assurances, Robert Tavenner allowed cabin improvements, assuring the cabin owners from time to time that the license agreements were a "formality" and there was to be no change in the way the cabins were held by the cabin owners; that while the Tavenner corporation was involved in selling the ranch, it permitted Martin Olsen and James Blodgett to purchase homes from previous owners without informing the new purchasers of the impending sale, merely submitting the usual license agreement to the new owners for execution; that by allowing the cabin owners to make improvements and to assume a long-term occupancy, Tavenner misled the cabin owners into believing they did not have to fear the loss of their investment and so allowed them to act to their detriment; that Louis Ward was advised Tavenner would not sell the ranch if Ward insisted on the cancellation of the license agreements; that Ward agreed to take the property although he knew, or through the reasonable exercise of inquiry, should have known, that the cabin owners hoped for a long-term occupancy and had made substantial improvements based upon the implied assurances of Tavenner; and, that such conduct amounted to constructive fraud against the cabin owners.

-8-

To be sure, there were no express assurances from Tavenner that the cabin owners had any right of possession of the real property beyond the permission stated in the license agreements. It is equally clear that Tavenner engaged in a course of conduct, as we have set forth in our statement of the facts, that gave the cabin owners an implied assurance of a somewhat permanent tenure sufficient that they made substantial investments in erecting ahd maintaining the cabins openly recognized by Tavenner. From our review of the record, it is abundantly clear to us that while Tavenner, through the license agreements, wanted to be in position to terminate the permission for any cabin owner it might find undesirable, it was never the intention of Tavenner, in procuring the agreements or in permitting the improvements, to use the license agreements for a wholesale termination of every cabin owner's permission in one clatter. In fact, Tavenner refused to do just that. We determine from the record that it was the intention of Tavenner to have a degree of control over who possessed the cabins, though it never exercised that control; that it wanted to be in a position, if it felt the need, to terminate any undesirable possessors of the cabins; and perhaps that the execution of the license agreements and the requirement of a nominal sum per year eliminated any potential future claim of adverse possession or prescriptive right.

We therefore conclude, though from a slightly different viewpoint, that the findings of the District Court are correct.

Ward particularly objects to the finding that it was not a bona fide purchaser. Ward contends that it relied on the language of the license agreements, that it had its counsel write the October 13, 1972 letter to the cabin owners,

-9-

and that the contract for deed with Tavenner included the statement that the consent of the licensees was not necessary to the execution of the contract for deed. The cabin owners point to the fact that Ward made no inquiry of the cabin owners with respect to their rights, and that the physical examination of the premises by Ward showed possession of the lake property by persons other than the record holder in the form of substantial permanent improvements, which put Ward on notice of something more than a 30-day terminable interest in the possession of the lands.

In Yost Farm Company v. Cremer (1968), 152 Mont. 200, 209, 447 P.2d 688, 693, we held that a purchaser of lands with actual knowledge of an intervening contract for purchase from the same owner was not an innocent purchaser without notice, and was subject to the prior contract holder's rights. It is generally conceded that when someone purchases land under circumstances which suggest outstanding equities in third parties, there is imposed on the purchaser a duty to make a reasonable investigation as to the existence of outstanding claims against the property, and one who fails to use due diligence to ascertain the facts within his reach is not an innocent purchaser. Berge v. Fredericks (1979), 95 Nev. 183, 591 P.2d 246; Modrok v. Marshall (Alaska 1974), 523 P.2d 172; MacEwen v. Peterson (1967), 102 Ariz. 209, 427 P.2d 527. When there appears possession of land by persons other than the record holder, which possession is inconsistent with the record title, there is a duty of inquiry imposed upon a purchaser of that land. See, Valley National Bank of Ariz. v. Avco Develop. Co. (1971), 14 Ariz.App. 56, 480 P.2d 671.

Applying those rules here, Ward is not an innocent purchaser. The letter of October 13, 1972 did not fulfill the reasonable diligence that was imposed upon Ward to make further inquiry.

We therefore determine from a review of the evidence presented in the record, that the District Court findings are supported by the evidence and that Ward is not entitled to the status of an innocent purchaser without notice.

In its conclusions of law, the District Court determined that the cabin owners had no right, title or interest in the lake property under the doctrine of adverse possession or prescriptive right, and their occupancy was based on permission from Ward's predecessors in interest. The District Court further concluded that the conduct of the predecessor land-owners created a constructive trust in the improvements placed on the property by the cabin owners and that the trust was imposed upon Ward, as the landowners' successor in interest, as an equitable lien on the property in favor of the cabin owners. The court determined, as an exercise of equity, that the equitable lien could be satisfied by a continued use by the cabin owners for a reasonable period of time or by compensation and money for the value of the structures from Ward.

The evidence supports these conclusions sitting in equity, and we find the District Court properly so concluded. In its judgment and decree, the District Court provided that in lieu of cash payment from Ward, the cabin owners may continue to occupy their particular cabin sites with the right of ingress and egress until December 31, 1987, at which time the licenses to occupy should terminate and if the improvements were not removed as set forth in the license

-11-

agreements, the improvements should become the property of Ward without payment. Additionally, the District Court provided that the cabin owners had the option (to be exercised by them before May 1, 1980), to receive payment from Ward for the cabin structures and fixtures. If any cabin owner and Ward could not agree on the purchase price, the court would reserve jurisdiction to hear evidence and to make a determination as to the amount Ward should pay for the improvements.

Ward contends that the judgment and decree violates the statute of frauds, the parol evidence rule, and disregards waiver by the cabin owners in signing the license agreements.

The statute of frauds, section 70-20-101, MCA, provides in essence that no estate or interest in real property can be created except by an instrument in writing.

The parol evidence rule is found in two statutes, sections 28-2-904, and 28-2-905, MCA, which provide in essence that the written agreement supersedes the oral negotiations or stipulations and that when the agreement is reduced to writing, it is to be considered as containing all the terms between the parties.

The written agreements relied upon by Ward are the purchase contract of July 21, 1972, the warranty deed from the seller to Ward, dated September 25, 1972, the further warranty deed, dated December 1, 1972, and a relevant commitment for title insurance, dated December 1, 1972. Attached to the contract for purchase was a schedule of the license agreements with the cabin owners, and, of course, the notation thereon, "consent of licensees to assignment not required."

There is an exception to the parol evidence rule when the validity of the agreement is the fact in dispute (section

28-2-905(1)(b), MCA). Here the validity of the terms of the license agreements is the fact in dispute. When the validity of the agreement is a fact in dispute, parol evidence is admissible, not to vary the terms of the instrument, but to show that what appears on its face as a valid, binding contract is in fact no such thing. Smith v. Fergus County (1934), 98 Mont. 377, 390, 39 P.2d 193.

As to the statute of frauds set forth in section 70-20-101, MCA, the next following statute, section 70-20-102, MCA, provides an exception to the statute of frauds for "any trust . . . arising or being extinguished by implication or operation of law." This exception, of course, applies to a constructive trust.

Ward's contention on the waiver argument is again based on a 30-day clause in the license agreements, and the probable existence of a similar clause in the earlier lease agreements. The waiver argument is another way of saying that the provisions of the license agreements control absolutely, and thus is another string to Ward's bow in contending that the court should not look outside the license agreements to determine the intention of the parties. Waiver is a voluntary relinquishment of a known right (Kelly v. Lovejoy (1977), 172 Mont. 516, 565 P.2d 321) and since the District Court concluded that the license agreements were not executed with the intention that the cabin owners abandoned their permissive rights in favor of a 30-day cancellation, a finding of waiver in the execution of the license agreements would be inconsistent with the court's conclusion that the license agreements did not reflect the true intention of the parties at the time.

The final issue raised by Ward is whether the court erred in imposing an equitable lien on the ranch owners

properties. Since this involves to some extent the cross-appeal, we will discuss these matters at the same time.

Following the judgment, the cabin owners moved the District Court to amend the judgment to provide for a possession of 50 years instead of the 13 years granted in the court's decree. The 50 years is contended to be the life expectancy of the cabins built on the lake properties.

The cabin owners raise other grounds on cross-appeal, but these are not argued.

Ward's contention that the District Court went beyond its power in establishing its decree for an equitable lien for a term of years, and the cabin owners contention that the term should be for 50 years, go to the power of the District Court in an equity case to fashion an equitable result. A court sitting in equity causes is empowered to determine the questions involved in the case and to do complete justice. Haymes v. City of Polson (1950), 123 Mont. 469, 477, 215 P.2d 950, 955. The court has all of the power requisite to render justice between the parties, particularly if the intent and disposition of one of the parties is not to perform his contractual obligations. Link v. State By & Through Dept. of Fish & Game (1979), _____ Mont. _____, 591 P.2d 214, 222, 36 St.Rep. 355, 365. The court obviously framed its judgment and decree in this case so as to give the cabin owners an option to receive, from Ward, the value of the cabin improvements, or to enjoy their lakeside cabins for a term of years considerably shorter than the useful life of the cabins. Under either option, Ward will not be unjustly enriched, and recognition is given by the District Court to the long-term intentions of Tavenner and the cabin owners. Both parties won something from the

-14-

District Court: the cabin owners, a recognition of their long-term rights and the value of their cabin improvements; and Ward, a method of obtaining eventually an unimpeded title to the lakeshore property. We find the result is equitable.

The judgment of the District Court granted the cabin owners a period of six months from the date of judgment in which to notify Ward in writing that the cabin owners were exercising their option to receive payment for the cabin structures and fixtures. The prosecution of this appeal has taken the case beyond the date fixed by the District Court for the exercise of such option. We therefore modify the judgment and decree and grant the cabin owners a period of six months from and after the date remittitur is handed down from this Court to the District Court, in which the cabin owners shall have the option to be exercised by written notice to the defendant Ward, to receive payment for the cabin structures and fixtures. Except as so modified, we deny the cross-appeal, and affirm the judgment and decree of the District Court, and remand the cause to the District Court for further proceedings therein in accordance with its judgment and decree.

_____
Justice

We Concur:

_____

_____
Justices

-15-

Mr. Justice Daniel J. Shea specially concurring:

I concur in the opinion of the Court, with the exception that I would permit the plaintiffs to use the property for a substantially longer time than until December 31, 1987.

The only evidence in the record on the length of time the plaintiffs should be permitted to stay on the premises, was presented by the plaintiffs, and the evidence presented was 50 years. After the trial court made its decision, plaintiffs moved the trial court to amend its findings and conclusions to permit the 50 years, but the trial court refused to so amend the findings and conclusions.

I do not say that 50 years must be the figure, but there is no evidence in the record for the trial court's decision to permit the plaintiffs to stay on the land until only December 31, 1987. I do not, however, deem it proper for an appellate court to set the number of years; that is the function of the trial court.

I would affirm the trial court in all respects except that I would remand for a determination of the number of years the plaintiffs should be permitted to stay on the land, based on the evidence in the record. That evidence supports a decision far beyond December 31, 1987.

This case is a prime example of what Corporate America through its activities in the State of Montana is doing to the citizens. It demonstrates the difference between ownership of land owned by residents of Montana and ownership of land owned by outside corporations who use this state as an economic playground.

I concur with the foregoing.

Justices