NO.   93-236

IN THE SUPREME COURT OF THE STATE OF MONTANA

1994

DENNIS THORNTON,

       Plaintiff/Appellant,

   -v-

SUSAN NISWANGER SONGSTAD,
SALLY NISWANGER, MICHELLE
NISWANGER LYTLE, RITA LAWSON,
and NORWEST CAPITAL MANAGEMENT
TRUST CO., f/k/a/ UNION
BANK AND TRUST CO., as Trustee,

       Defendants/Respondents.

FILED

FEB 15 1994

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:   District Court of the Eleventh Judicial District,
              In and for the County of Flathead,
              The Honorable Michael H. Keedy, Judge presiding.

COUNSEL OF RECORD:

       For Appellant:

           Chris Christensen, Kalispell, Montana

       For Respondents:

           James C. Bartlett, Hash, O'Brien & Bartlett,
           Kalispell, Montana

Submitted on Briefs:  December 16, 1993

Decided:  February 15, 1994

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

This is an appeal from an Eleventh Judicial District Court, Flathead County order, granting the defendants' motion for summary judgment. We affirm.

The sole issue on appeal is whether the District Court erred in granting the defendants' motion for summary judgment.

According to Plaintiff/Appellant Dennis Thornton's (Thornton's) deposition, he became interested in the property at issue (160 acres - up Ashley Lake Road in Kalispell) in April of 1990. The property was shown to Thornton by Dave Bailey (Bailey), a real estate agent for Glacier Realty, who also stated that he could sell the property because it was listed through the Multiple Listing Service. The property was owned by Norwest Capital Management and Trust Company (Norwest), Trustee, as to an undivided one-half and by Susan Niswanger Songstad, Sally Niswanger, Michelle Niswanger Lytle and Rita Lawson (in undivided fractional shares) as to the remaining undivided one-half.

Thornton sought out American Timber and proposed that he borrow the money to purchase the land from that company and that he deliver the timber to American in order to pay off the loan. When Thornton secured the loan commitment for the property, he went to Bailey's office to make an offer of $60,000. Bailey handwrote an offer in the form of a proposed buy/sell agreement and told Thornton that he would have to put up $500 in earnest money. The offer also provided that the seller or agent would point out the property corners to buyer's satisfaction and that the seller would

2

demonstrate that roadway and utility easements to the property existed. The offer was dated April 27, 1990. The offer was given to Susan Niswanger **Songstad** (Songstad), one of the defendant/owners of the land.

The offer was returned with some sections deleted and new sections added, making a counteroffer. **Songstad** wanted $1,500 earnest money to which Thornton agreed if the listing agent would take him to the property to ensure that he had been viewing the correct property. Thornton signed the counteroffer on May 7, 1990 and closing was set for May 27, 1990. The sellers did not, however, appear at the closing. Accordingly, the buy/sell agreement/offer was rewritten on May 30, 1990. The proposed May 30 offer incorporated the terms of the previous offer along with some new terms and was intended to supersede all prior agreements.

Thornton stated in his deposition that he wanted all the signatures of the people involved on the May 30 agreement. At the time Glacier Realty typed the May 30 agreement, Thornton gave Bailey a check for $1,500. Bailey telephoned **Songstad** in Washington, read the new agreement to her and, when she had agreed to all the new terms, Thornton signed the agreement. The agreement was then sent to **Songstad** for the signatures of all the owners. The agreement was signed by Susan Niswanger Songstad, Sally Niswanger, Rita Lawson and Michelle Niswanger Lytle, four of the five co-owners of the 160 acres. **Norwest** did not sign the agreement.

For a second time, the land sale did not close. Thornton then

filed a six-count complaint against the defendants, alleging breach of the May 30 buy/sell agreement and seeking specific performance and damages against the four women who signed the agreement and against Norwest. In due course, the defendants filed a motion for summary judgment, which the District Court granted on February 10, 1993.

"Under Rule 56(c), M.R.Civ.P., summary judgment is proper if the record discloses no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law." Lutey Construction • The Craftsman v. State (Mont. 1993), 851 P.2d 1037, 1038, 50 St.Rep. 321, 321-22, citing Kaseta v. N. Western Agency of Gr. Falls (1992), 252 Mont. 135, 138, 827 P.2d 804, 806. The standard that this Court, as an appellate court, applies in reviewing a grant of summary judgment is the same as that initially utilized by the trial court under Rule 56, M.R.Civ.P. McCracken v. City of Chinook (1990), 242 Mont. 21, 24, 788 P.2d 892, 894.

Thornton offered to purchase 160 acres of land from the defendants. However, only four of the five co-owners signed the buy/sell agreement. Thornton claims that the four owners who signed the buy/sell agreement can bind the fifth co-owner, and he demands specific performance • the sale of the entire 100% ownership interest in the 160 acres. The defendants contend that since all the owners of the real property did not sign the buy/sell agreement, a valid contract does not exist, and Thornton cannot compel the defendants to sell the property to him by the remedy of specific performance. The District Court agreed with the

4

defendants.

## DISCUSSION

It is axiomatic that a purchaser may not be granted the remedy of specific performance in connection with the claimed breach of a purported agreement for the sale of land unless it is first established that there is a valid contract in existence. In Schwedes v. Romain (1978), 179 Mont. 466, 587 P.2d 388, we cited with approval the general rule that:

> [w]hile it is universally recognized that equitable relief by way of specific performance does not follow as a matter of course by establishing the existence and validity of the contract, the performance of which is sought, the existence of a valid contract is essential to the remedy of specific performance. In order for equity to decree specific performance, it is necessary that there be in existence and in effect a contract valid at law and binding upon the parties against whom performance is sought, for specific performance is never applicable where there is no obligation to perform. (Citation omitted.

Schwedes, 587 P.2d at 391.

It is black-letter law that, essential to the existence of a contract, there be:

(1) identifiable parties capable of contracting;
(2) their consent;
(3) a lawful object: and
(4) a sufficient cause or consideration.

Section 28-2-102, MCA. The element that defendants contend is absent here is consent. The Agreement to Sell and Purchase dated May 30, 1990 (the buy/sell agreement), contains the signature of the four women co-owners but does not contain the signature of Norwest, owner of the other 50% of the 160-acre tract.

If Thornton's offer was to purchase 100% ownership of the land

5

but owners of only 50% of the ownership interest of the land signed the contract and thus accepted his offer, then a valid contract did not come into existence because Thornton did not have the consent of all the owners of the title to the property which was the object of the contract.

In Weigand v. Mt. Land & Real Estate Inv., Inc. (1986), 223 Mont. 137, 724 P.2d 194, we held that "[t]he Earnest Money Receipt and Agreement to Sell and Purchase [was] not a legally enforceable contract because sellers failed to sign it," noting that one of the essential elements for a valid contract required by § 28-2-102, MCA, -- consent -- was lacking. "Had sellers consented to the Agreement, they needed only to sign it. They did not. There is nothing in the record to show they consented to the Agreement." Weisand, 724 P.2d at 196.

Accordingly, we must first determine the percentage of ownership interest for which Thornton was contracting -- 100% including the interest of Norwest or simply the 50% interest owned by the four co-owners who signed the May 30 buy/sell agreement.

Thornton stated numerous times in his deposition that he wanted the signatures of all the owners of the property. He stated that he was "under the impression on the 27th of May that [he] was going to be the owner of the property."

In his deposition Thornton testified:

Q. And there's no doubt in your mind that you gave specific and explicit instructions to Mr. Bailey that your offer needed to be signed by everyone who owned the property and that he understood that?

A. Yes, I believe that is the way it was.

6

Additionally, he stated:

> A.   I had told Dave Bailey that I wanted all of the signatures of the owners of the property on the new buy/sell agreement.
>
> Q. What did he say in response?
>
> A. Well, he had talked to them on the phone, and I had told him that I wanted everybody to sign that and that I was going to make a new -- that I would make a new offer and that I wanted all the signatures on it.   If I remember right, after we had it typed up, Dave Bailey called Susan Songstad and read it to her over the phone.
>
> . . .
>
> Q. But you explicitly told him you wanted all the owners to sign the buy/sell?
>
> A.   Yes, I did.

Thornton wanted to purchase the land so he could log it.  That would have been impossible without complete ownership of 100% of the title to the property, or, at least, some authority from Norwest, absent its agreement to sell.  See §§ 70-16-107 and 108, MCA.

Further evidence that Thornton was contracting for 100% of the ownership interest in the subject property is derived from the fact that he was aware of Norwest's undivided 50% ownership interest before he signed the May 30 buy/sell agreement.  During his deposition, Thornton stated that he received the commitment for title insurance "somewhere around the 15th of May" and "learned that title was held by more than Susan Songstad, the only individual [he] had seen paperwork on...."  The commitment for title insurance states that:

> Title to the Fee Simple estate or interest in said land is at the effective date hereof vested in:

7

> NORWEST CAPITAL MANAGEMENT AND TRUST COMPANY, formerly the UNION BANK AND TRUST COMPANY, as Trustee, as to an undivided 1/2 interest.
>
> SALLY NISWANGER, as to an undivided 1/12 interest.
> SUSAN NISWANGER SONGSTAD, as to an undivided 1/12 interest.
> MICHELLE NISWANGER LYTLE, as to an undivided 1/12 interest.
> RITA LAWSON, as to an undivided 1/4 interest.

Thornton's deposition reveals that he knew or should have known that Norwest was one of the co-owners of the land. However, Norwest did not sign the buy/sell agreement, and Thornton did not attempt to obtain its signature.

> It is generally conceded that when someone purchases land under circumstances which suggest outstanding equities in third parties, there is imposed on the purchaser a duty to make a reasonable investigation as to the existence of outstanding claims against the property, and one who fails to use due diligence to ascertain the facts within his reach is not an innocent purchaser.

Rose v. Castle Mountain Ranch, Inc. (1981), 193 Mont. 209, 218, 631 P.2d 680, 685. Thornton did not use reasonable diligence and investigate to determine who the co-owners of the land were and ensure that all of the co-owners signed the buy/sell agreement.

Finally, the allegations by Thornton in his complaint lead inescapably to the conclusion that his intention was to purchase 100% of the ownership interest in the property, and nothing less than 100%. The general rule, applicable here, and in accord with our decision in Weigand, is set forth at 71 Am. Jur. 2d, Specific Performance § 175 as follows:

> ...In many cases the negotiations and the contract prepared for execution are construed as contemplating a joint sale only, or at least conditioned on all nominal vendors becoming bound. Where such is the construction it is considered that [when one or more vendors fail or

8

refuse to sign] no contract of sale came into existence, in which event, or course, the vendee cannot obtain a decree of specific performance against any of the signers nor recover damages as for the breach of a sales contract.

Thornton, nevertheless, argues that his oral requests to have all of the co-owners sign the buy/sell agreement were superseded by the written buy/sell agreement itself, which did not make any provision requiring the signatures of all the owners. Although § 28-2-904, MCA, does provide that any oral negotiations or stipulations which precede or accompany the execution of the written instrument are superseded by the written instrument, parol evidence can be considered if the validity of the agreement is the matter which is in dispute. Section 28-2-905(1)(b), MCA. Here, because the essential question is whether the agreement is a valid contract, parol evidence can be considered. "'[W]here the validity of the agreement is the fact in dispute,' parol evidence is admissible, not to vary the terms of the instrument, but to show that what appears on its face as a valid, binding contract is, in fact, no such thing." Smith v. Fergus County (1934), 98 Mont. 377, 390, 39 P.2d 193, 197.

Finally, Thornton states that he was under the impression that the four women co-owners could bind the trust to the buy/sell agreement, and that the manager of the trust told him that he [the manager] would go along with any plan for the land the four women decided. Thornton argues that those are material facts in dispute which defeat summary judgment.

In support of their motion for summary judgment, the

9

defendants established: (1) that there was a written offer signed by Thornton and accepted by the four women for the sale and purchase of the 160 acres: (2) that the four women owned an undivided 50% interest and that Norwest owned the remaining undivided 50% interest as trustee: (3) that Thornton knew before signing the buy/sell agreement that there were five undivided owners and that to obtain 100% of the ownership interest he would have to have all five co-owners sign the agreement; and (4) that Thornton was contracting for 100% ownership interest in the property.

Having established those material facts, the burden shifted to Thornton to raise his claimed material factual issue -- namely that Norwest, as trustee, was controlled by the four women co-owners and that they could compel Norwest to sign the buy/sell agreement. That was his theory: proving that theory would benefit his case and defeat the defendants' motion for summary judgment; and, accordingly, he had the affirmative duty to bring before the court substantial evidence and specific material facts supporting his theory by filing affidavits or through sworn deposition testimony or interrogatory answers in the record. Gross v. Myers (1987), 229 Mont. 509, 514-15, 748 P.2d 459, 462-63.

Fatal to Thornton's claim in that regard, however, is his failure to adequately raise, in opposition to defendants' motion for summary judgment, any disputed material fact as to the four women co-owners' exercise of control over the trust. "[W]hile the initial burden of proof [on a summary judgment motion] must attach

to the movant, that burden shifts where the record discloses no genuine issue of material fact. Under these circumstances, the party opposing the motion must come forward with <u>substantial</u> <u>evidence</u> raising the issue." (Citations omitted. Emphasis added.) Downs v. Smyk (1979), 185 Mont. 16, 21, 604 P.2d 307, 310. "Further, the non-moving party must set forth <u>specific facts</u> and cannot simply rely upon their pleadings, nor upon <u>speculative,</u> <u>fanciful, or conclusory statements</u>." (Citations omitted. Emphasis added.) Thomas v. Hale (1990), 246 Mont. 64, 67, 802 P.2d 1255, 1257.

In the instant case, Thornton did nothing more than offer his own conclusory hearsay statements from his July 29, 1992 affidavit claiming that the trust manager told him that he [the manager] would agree to any decision of the four women co-owners. His assertion that the manager would follow any decision of the four women co-owners is not otherwise supported in the record. Kronen v. Richter (1984), 211 Mont. 208, 213, 683 P.2d 1315, 1318.

Rule 56(e) M.R.Civ.P., provides in pertinent part that:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. . . .

Thornton's affidavit dated July 29, 1992, filed in opposition to defendants' motion for summary judgment consists almost entirely of statements allegedly made to Thornton by other persons regarding Susan Niswanger Songstad's supposed authority to sell the property and the four women co-owners' control over the trust. Those

11

statements in Thornton's affidavit are not of his own personal knowledge and fit within the definition of hearsay -- statements, other than ones made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matters asserted. Rule 801(c), M.R.Evid.

In Eberlv. Scofield (1990), 244 Mont. 515, 519, 798 P.2d 536, 538, we held that it was proper for the district court to strike the affidavit of a party filed in a summary judgment proceeding, noting that the statements made in the affidavit which related to the issue on summary judgment were not of the affiant's personal knowledge but were all hearsay.

While the statements attributed by Thornton to non-parties are clearly hearsay and, therefore, inadmissible under Eberl, the statements in Thornton's affidavit attributed to the trust manager might, nevertheless, still be admissible as an exception to the hearsay rule inasmuch as the trust was a party defendant to the action. With respect to the trust, Thornton states as follows in his affidavit:

> ...
>
> 5.     After filing this lawsuit and being informed that Norwest Capital Management and Trust Co. was not willing to sell the property I found out the individual's name and telephone number who was managing the trust interests of Susan Niswanger Songstad, Sally Niswanger, Michelle Niswanger Lytle, and Rita Lawson, (hereafter referred to as the Niswangers).
>
> 6.     I contacted the individual identified as the manager of the Niswangers trust interests. Upon questioning him about the sale of the property he informed me that Susan Niswanger Songstad was in charge of the property and that whatever the Niswangers agreed to do with the property was fine with him as manager of the trust.

12

7. Subsequently, I made contacts with this trust manager concerning terms to settle this matter but was always told by him to contact Susan Niswanger Songstad, that she was in charge of selling the property, that he only did what she told him to do.

The statements purportedly made by the trust manager appear to be admissions of a party-opponent, and therefore not considered hearsay under Rule 801(d)(2), M.R.Evid., which states that a statement is not hearsay if "[t]he statement is offered against a party and is...(D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of that relationship."

However, there is nothing in Thornton's affidavit or in the record identifying the trust manager or demonstrating that the person Thornton spoke with had the authority as an agent or employee of the trust to make binding statements about the trust or concerning the beneficiaries' control over the trust's management of the property.

The court in Passovoy v. Nordstrom, Inc. (Wash. 1988), 758 P.2d 524, 527, dealt with an almost identical issue as that posed here. There the appellate court held that the trial court properly struck as hearsay and not as admissions of a party-opponent, that portion of a summary judgment affidavit which contained statements attributed by the affiant to the defendant-store's employee where there was neither independent verification of the existence of the agency between the party opponent and the employee nor independent evidence as to the scope of the agency relationship. The Washington court held that the fact and scope of the agency could

13

not be proved from the hearsay statements alone.  *Passovoy*, 758 P.2d at 528.

Similarly, here, Thornton's affidavit fails to lay any foundation for the use of the trust manager's statements as substantive evidence.  The affidavit contains no statements to establish the actual identity of the trust manager or to establish his authority to speak on behalf of the trust or its beneficiaries. Thornton provided no more than his own bare assertion that he spoke with the trust manager and that the manager stated that whatever the four women "agreed to do with the property was fine with him." The testimony provided in Thornton's affidavit does not provide a sufficient indicia of credibility:  "independent proof of the existence of the agency and its scope must be shown."  *Passovoy*, 758 P.2d at 528.  Clearly, the information concerning the manager's statements found in Thornton's affidavit does not qualify as a statement of a party-opponent, and therefore consists of hearsay to which Thornton himself was not competent to testify.  Accordingly, we conclude that Thornton's affidavit does not meet the requirements of Rule 56(e), M.R.Civ.P., and fails to properly raise the disputed issues of material fact that he claims are critical to his case.

Thornton could have deposed the manager of the trust or he could have filed an affidavit from the manager establishing his authority and stating that he [the manager] would agree with any decision made by the four women co-owners.  He did neither. Thornton produced nothing in writing whereby Norwest authorized any

14

of the four women co-owners to act on its behalf or to sell its interest in the property, or to bind the trust to the buy/sell. See §§ 28-2-903(1)(d) and 28-10-203, MCA. Thornton did not offer the trust instrument of which the four women co-owners were purportedly the beneficiaries which might have conceivably showed their power or control over the trust.

While Thornton offered evidence of other transactions between the trust and the four women co-owners, that evidence did nothing in the way of proving the fact of their control over the trust in the land sale at issue here and which Thornton claimed was material and dispositive of defendants' motion for summary judgment.

In short, Thornton simply did not come forward with any substantial evidence that would raise a genuine issue of material fact as to the four women co-owners' control over the trust. Kronen, 683 P.2d at 1318. See also Downs, 604 P.2d at 310. If Thornton possessed such evidence, it was his burden to produce it. He did not, and his hearsay affidavit statements were inadequate to carry his burden.

Ultimately, the defendants carried their burden to show that there were no genuine issues of material fact, and, when the burden shifted to Thornton, he did not come forward with specific facts and substantial evidence to support his theory of the case. The District Court correctly concluded there was no genuine issue of material fact concerning the four women's control over the trust. Kronen, 683 P.2d at 1318. As we have previously stated,

> [f]ailure of the party opposing the motion to either raise or demonstrate the existence of a genuine issue of

15

> material fact, or to demonstrate that the legal issue should not be determined in favor of the movant, is evidence that the party's burden was not carried. Summary judgment is then proper, the court being under no duty to anticipate proof to establish a material and substantial issue of fact.

Taylor v. Anaconda Federal Credit Union (1976), 170 Mont. 51, 57, 550 P.2d 151, 154.

The facts presented to the District Court demonstrate that Thornton was contracting for 100% of the title to the land at issue and that he knew that he must obtain the signature of the trust or prove that the trust was under the control of the four other co-owners. Thornton failed in his burden to establish material disputed facts, and accordingly, we hold that the District Court was correct in concluding that no contract was in existence, and that defendants were entitled, as a matter of law, to summary judgment in their favor.

Affirmed.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____

_____

_____
Justices

16