No. 00-203

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 257

301 Mont. 482

10 P.3d 819

JOHN STILES,

Petitioner and Respondent,

v.

DEPARTMENT OF PUBLIC HEALTH AND

HUMAN SERVICES, STATE OF MONTANA,

Respondent and Appellant.

APPEAL FROM: District Court of the First Judicial District,

In and for the County of Lewis and Clark,

Honorable Jeffrey M. Sherlock, Judge Presiding

COUNSEL OF RECORD:

For Appellant:

Lonnie J. Olson, Special Assistant Attorney General, Child Support

Enforcement Division, Helena, Montana

For Respondent:

John Hollow, Attorney at Law, Helena, Montana

Submitted on Briefs: August 3, 2000

Decided: September 26, 2000

Filed:

_____

Clerk

Chief Justice J. A. Turnage delivered the Opinion of the Court.

¶1 The First Judicial District Court of Montana, Lewis and Clark County, reversed the Financial Responsibility Decision and Order issued by the Child Support Enforcement Division of the State of Montana, Department of Public Health and Human Services, against John Stiles, and found that because Stiles' sister, the legal guardian of the child, had no right to receive support, no right to support could therefore pass to the State. We affirm the District Court's ruling.

¶2 The State raises the following issues on appeal:

¶3 1. Did the District Court err when it held that equitable estoppel and waiver applied prospectively to relieve John Stiles of current and future support obligations for his son?

¶4 2. Did the District Court err when it held the statutory right of the State of Montana to be reimbursed for the payment of public benefits on behalf of the child was negated by the conduct of the child's custodian?

¶5 Neal Stiles was born to John and Renna Stiles on November 10, 1986, the youngest of three children. Within weeks after Neal's birth, the Stiles separated. The Stiles were living in California, with John serving in the U.S. Navy. John was given responsibility for Neal's care, and asked his sister in Montana, Cynthia Huffman, now Cynthia Golding, if she would care for Neal for a short time while he fulfilled his duties at sea. She and her then-husband, Brian Huffman, agreed.

¶6 Cynthia has sought legal custody of Neal since that time, availing herself of courts in both Montana and California on numerous occasions. Her efforts met with differing results, including an award of physical custody handed down by a California court.

Cynthia often did not comply with court orders resulting from these efforts, including orders to allow visitation of Neal by John. John initially offered to pay the Huffmans for Neal's care, but the Huffmans refused to accept the money, saying it was not needed. At all times John has covered Neal under his health insurance plan.

¶7 Cynthia applied for and was granted public assistance beginning in November 1995 for a four-month period, assigning any right to child support she may have had to the State of Montana. A Notice of Financial Responsibility issued to John on May 3, 1996, establishing John's monthly obligation for Neal at $388. John requested a hearing to adjudicate this matter, which was held June 27, 1996. Administrative Law Judge (ALJ) Lori Ballinger of the Child Support Enforcement Division then issued a Financial Responsibility Decision and Order to John in November of 1996 establishing his obligation to provide financial support for Neal in the amount of $511 per month. Stiles asked Cynthia to sign a waiver of this obligation, but she refused.

¶8 John petitioned for judicial review. The District Court remanded the matter back to ALJ Susan Schafer to make findings of fact regarding John's claim that Cynthia had waived her right to receive child support or that she was equitably estopped from asserting or assigning them. The District Court reserved responsibility for determining whether the facts found by the ALJ satisfied the elements of waiver and equitable estoppel. The ALJ found that the requisite elements of waiver and estoppel were present, and these findings were upheld by the District Court. In addition, the court found that because Cynthia had no right to receive support, she could not then convey to the State rights greater than those to which she was entitled. The State of Montana appeals.

## DISCUSSION

¶9 This Court stands firmly behind the precedents and principles providing for the maintenance and welfare of children by those responsible. Along with these responsibilities, however, come rights. Here, the sister of John Stiles, Cynthia Huffman, now Cynthia Golding, has done everything within her power and under the color of law to deny John's parental rights. We have previously stated, "a natural parent's right to care and custody of a child is a fundamental liberty interest, which must be protected by fundamentally fair procedures." *In re R.B., Jr.* (1985), 217 Mont. 99, 103, 703 P.2d 846, 848. It appears from the record that Cynthia has been entirely successful in that endeavor. She has stated her intent to make the child her own to her mother and sister, immediately after being asked as a favor under difficult circumstances to look after the newborn child

for no more than a few months by her brother. She has on at least one occasion refused John's offer of financial support for Neal. She has flaunted court orders to allow John to see his child. She has admonished Neal to run and get the nearest police officer if John ever approaches him, with no legal or rational basis that appears in the record. We concur with the District Court that as long as Neal remains with Cynthia there will be no award of child support in this matter, but should that change this issue must be reconsidered. Because she has no right to support, she has no right to assign to the State.

## Issue 1

¶10 Did the District Court err when it held that equitable estoppel and waiver applied to relieve John Stiles of an obligation to provide financial support for his son?

¶11 Neither John nor the State has cited legal authority to this Court that is truly reflective of the facts and legal and equitable issues present here. Although both have cited authority from other jurisdictions to support their positions, we find Montana's statutes and legal precedent adequate to address the relevant legal issues.

¶12 "In matters and proceedings of an equitable nature, this Court shall review all questions of fact arising upon the evidence presented in the record, whether the same be presented by specifications of particulars in which the evidence is alleged to be insufficient or not, and determine the same, as well as questions of law. . . ." Section 3-2-204(5), MCA; *Rase v. Castle Mtn. Ranch, Inc.* (1981), 193 Mont. 209, 216, 631 P.2d 680, 684. We will not reverse the trial court in an equity case on questions of fact unless there is a decided preponderance of the evidence against the findings of the trial court. *Lumby v. Doetch* (1979), 183 Mont. 427, 431, 600 P.2d 200, 202 (stating further that we will presume the findings and judgment by the district court are correct, and when the evidence furnishes reasonable grounds for different conclusions, the findings of the district court will not be disturbed)*; Boz-Lew Builders v. Smith* (1977), 174 Mont. 448, 452, 571 P.2d 389, 391. Findings of fact in matters of an equitable nature as well as at law are to be upheld unless they are clearly erroneous. Rule 52(a), M.R.Civ.P. Finally, the Legislature contemplated instances where a court would not award child support. In such cases the court must state its reasons for not so doing. Section 40-4-204(3)(c), MCA.

¶13 The State observes in its initial brief that, "[i]n Montana, waiver and estoppel are not available to an obligor to use as a sword, to defeat a child's right to current or future support." Waiver and estoppel are, however, available as a legal shield, to prevent

inequitable results when the best interests of the child are not in dispute. The case perhaps most parallel to the instant case is *State ex rel. Blakeslee v. Horton* (1986), 222 Mont. 351, 722 P.2d 1148. There, this Court used equitable estoppel to disallow a mother's claim for child support when both the mother and father had explicitly agreed that if the father stayed out of the mother and child's lives, they would stay out of his. The agreement was mutually observed over fourteen years. We stated then:

"[S]he can turn the clock backwards on the understanding which was entered into and became consummated by mutual observance over the years, and create a financial windfall situation-one that can be pursued through County prosecuting offices by filling out and signing forms in a local office without any personal expense to her. *The father and child, on the other hand cannot turn the clock backwards to recapture the association which they should have had and could have had . . . . Equity cannot allow the mother to participate in nullification of the purpose of the law in fact and, at the same time, allow her to claim the benefit of it in theory, simply because there is a meter running which can total a dollar loss in child support, but nothing to total the loss of a father-son association."*

*Blakeslee, 222 Mont. at 354-55, 722 P.2d at 1150-51 (emphasis added).*

¶14 No more prescient prose could have been written for the case *sub judice*, where the facts are even more egregious. Here, the record reveals a father who aggressively sought to fulfill his legal and moral responsibilities as a parent to his son, only to be thwarted by his sister who was entrusted with the child's care as a favor to her brother, ostensibly for a brief time. It was Cynthia's stated and uncontroverted intention to keep this child, in spite of both his father's and mother's wishes and intentions.

¶15 Just as in *Blakeslee,* no extenuating circumstances had been established to justify a fourteen-year delay in seeking child support (e.g., an unsatisfied material need of the child over the years, or that may have recently arisen), and neither have such circumstances been established here. Furthermore, Cynthia has been especially litigious, having initiated numerous court proceedings in both Montana and California, including adoption proceedings and intervention in John and Renna Stiles' divorce proceedings. Each of these court appearances was an opportunity to request child support, but her principal concern appeared to be securing custody of the child, which was granted in 1992.

¶16 Collectively, these facts and circumstances satisfy the elements of equitable estoppel

as found by the ALJ and upheld by the District Court. We have previously ruled that there need not be an actual agreement between the parties for equitable estoppel to apply when the requisite elements have been met, and the obligee has impliedly consented to an arrangement other than the payment of the judgment. *In re Marriage of Shorten*, 1998 MT 267, ¶ 17, 291 Mont. 317, ¶ 17, 967 P.2d 797, ¶ 17. The elements of equitable estoppel are:

> (1) [C]onduct, acts, language, or silence amounting to a representation or concealment of material facts; (2) these facts must be known to the party estopped at the time of his conduct, or at least the circumstances must be such that knowledge of them is necessarily imputed to him; (3) the truth concerning these facts must be unknown to the party claiming the benefit of estoppel at the time it was acted upon; (4) the conduct must be done with the intent, or at least with the expectation, that it will be acted upon by the other party or under circumstances that it is both natural and probable that it will be so acted upon; (5) the conduct must be relied upon by the other party and, thus relying, he must be led to act upon it; and (6) he must in fact act upon it so as to change his position for the worse.

*Marriage of Shorten, ¶ 18.*

¶17 The findings of the ALJ and the District Court support a conclusion that the elements of equitable estoppel have been satisfied. With regard to the first two elements of equitable estoppel, the Findings of Fact set forth in the Order Granting CSED's Motion note the following:

> (5) Betty Stiles is the mother of Ms. Golding (Cynthia) and Mr. Stiles. She was present when Neal first went to live with Ms. Golding and Brian Huffman. Ms. Golding told Ms. Stiles that it was fate that Neal had come to live with them and that he was meant to be her child because Brian's deceased father's name was Neal. Ms. Golding told Ms. Stiles that she had gone to the County Attorney to find out what she had to do to keep Neal. Ms. Golding told her that she planned to keep Neal for one year and then file the appropriate adoption papers.

> (6) Beth McDonough is the sister of Ms. Golding and Mr. Stiles. She was present when Neal first arrived in Helena. Ms. Golding stayed with Ms. McDonough while waiting for John Stiles' and Neal's arrival. Ms. Golding told Ms. McDonough that Neal was destined to be in her life because there have been so many coincidences.

One example given by Ms. Golding was that Neal's name is the same as Brian Huffman's deceased father. Ms. Golding and Mr. Huffman could not have children. They tried to adopt but failed. Ms. Golding believed that this was supposed to be, that God had sent this child to her, and that she was supposed to raise him. Ms. McDonough testified that Ms. Golding was adamant about not returning Neal because she felt John and Renna were inadequate parents. Immediately after Ms. Golding obtained custody of Neal she began saying that she would do anything to keep him. . . .

(11) . . . Ms. Golding told Betty Stiles that she had the resources to keep fighting for Neal and that she would do so until John Stiles could not afford to fight her anymore.

In addition, in the Order on Remand the ALJ found:

(30) The mother, Betty Stiles, testified that Cynthia Huffman gave her the impression she was going to keep Neal and that she had no intention of returning Neal to the parents at any time.

(31) Betty Stiles further testified that Cynthia Huffman informed her that her brother Johnny could not afford to continue the fight for the custody of Neal and that they were going to continue in litigation until he was broke.

¶18 Here, Cynthia has given more than implied consent to the terms of this agreement. In contrast to the mutuality of agreement in *Blakeslee*, Cynthia has had nearly unilateral control over the terms of the entire arrangement. It is disingenuous of her to now claim that she is somehow aggrieved when she has herself orchestrated the circumstances she now faces. Her conduct and acts in denying John the ability to see his son, coupled with her silence to him regarding her intent to keep Neal when the record supports the conclusion that she had many opportunities within and without the courts to assert her intentions, and which were clearly known to her at the time given her overt statements to others, satisfy the first two elements of equitable estoppel.

¶19 There is no indication in the record that John had any way of knowing that Cynthia would make every effort within the court system and without to sever his parental rights, and then more than twelve years hence expect him to pay child support either retroactively or prospectively. John's belief was that at the time when Cynthia's plan to exhaust his

financial and emotional reserves was successfully implemented, she and her then-husband would provide for and raise the child. The ALJ found that, "[h]er actions would not have lead a reasonable person to believe she would have wanted Mr. Stiles to participate in the raising of Neal even in the limited capacity of providing financial support." Therefore we rule the third element of equitable estoppel is satisfied.

¶20 The record clearly establishes Cynthia's intent to exhaust John's resources so that he would cease his efforts to become reunited with his son, and she and her husbands would then supplant him as parents. These actions embody the fourth element, i.e., the conduct must be done with the intent that it will be acted upon by the other party. John did cease his efforts to regain custody of his son for this very reason. We conclude the fourth element of equitable estoppel is thus met.

¶21 Elements five and six are intertwined. Cynthia's conduct must have been relied upon by John, he must have acted upon her conduct, and acted in a way that changed his position for the worse. Here, the record establishes that John relied in innumerable ways on Cynthia's conduct, beginning with her assertions that Neal was unavailable to his father because of Cynthia's vacation plans, forcing him to leave Montana without seeing his son and return to California; he further relied on Cynthia's conduct as manifested in her litigiousness, finally leading to exhaustion of his resources and abandonment of his efforts to regain his son. These resources could have been better directed to the well-being of the child. Cynthia's protestations and denials ring hollow in the face of her actions. Few acts constitute a worsening of one's position than losing a child, no matter how lost. The fifth and sixth elements of equitable estoppel have thus been met.

¶22 We conclude that all six elements of equitable estoppel have been met in this case, and that therefore Cynthia Golding has no right to receive child support from John Stiles either retroactively or prospectively. Cynthia has in effect reaped the rewards of her bargain.

¶23 Because the elements of equitable estoppel have been satisfied, no protracted analysis of the issue of waiver is necessary. However, we concur with the District Court's analysis in this regard, finding that Cynthia has in fact waived her right to support from John through her language and conduct, elements of waiver to which the parties have stipulated. As the District Court found:

> Cynthia actively attempted to sever the right and ability of the Obligor to adequately

parent the Child. She did this making her intentions to keep and raise Neal as her own known to her mother and sister, by repeatedly denying Mr. Stiles access to the Child, by filing court actions to terminate Mr. Stiles' parental rights to gain permanent custody of Neal, thereby wearing down Mr. Stiles' financial resources, and by intervening in Mr. Stiles' divorce proceedings so she could participate in the custody portion of the proceedings.

¶24 The District Court poignantly noted:

The record reflects that John fought for years to establish a relationship with his son Neal and to be able to provide for Neal in his home. Cynthia defied a Montana court order demanding the child be returned to his parents, defied a California court order regarding John's visitation rights, and accepted a California court order that declined to award her any child support for Neal's care.

¶25 The State, perhaps acknowledging the unsavory facts leading to the case at bar, argues eloquently that the doctrine of equitable estoppel has historically been applied retrospectively, and should not apply prospectively, concluding that applying equitable estoppel to future support is tantamount to punishment of Cynthia. However, that is not our view, nor our purpose. Cynthia sought legal custody before the California court system, with some success. She has somehow evaded consequences for her refusals to obey court orders and over the years has effectively become the only true and constant parent Neal has known. Neal's own biological mother has misspelled his name in court documents in the record before us. John Stiles has accepted, as perhaps only a true parent can, that to take Neal from Cynthia at this time would be detrimental to his child under the totality of the circumstances. We find that the best interests of the child are likely best served by the present arrangement, and that based on the record, Cynthia is adequately providing for Neal's needs while reaping the benefits of his companionship and the elements of relationship, all of which have been denied John.

¶26 This is consistent with statutory language regarding the obligation of a parent for support and education of their children. "The parent or parents of a child shall give the child support and education suitable to the child's circumstances." Section 40-6-211, MCA. Here, because there has been no showing in the record that the child's needs are not being met, an order of additional support will not be forthcoming. The State raises the point that even in the case of voluntary relinquishment of parental rights and responsibilities, a parent will still be liable for support. Section 42-4-402, MCA. Here,

however, we have an *involuntary* relinquishment of parental rights, and we will not visit upon John the normal responsibilities under these unique circumstances when the needs of the child are being met and where he has at all times provided health insurance for the child.

¶27 The State cites a series of cases that have dealt generally with the issues of the instant case. The principal cases include *In re the Support of Krug* (1988), 231 Mont. 78, 751 P.2d 171; *In re Marriage of Neiss* (1987), 228 Mont. 479, 743 P.2d 1022; and *Fitzgerald v. Fitzgerald* (1980), 190 Mont. 66, 618 P.2d 867. These cases are distinguished from the case at bar primarily on their facts. In all these cases there was court-ordered support adjudicated at the time of a dissolution of marriage, and an explicit or implicit finding of need on behalf of the children, none of which is found here. In *Support of Krug*, the parties entered into a court-sanctioned modification that was found unconscionable *ab initio* because it abrogated child support forever, regardless of circumstances, and no insurance was provided for the children, which is not the case here. In none of these cases did the Court analyze the individual elements of either equitable estoppel, or laches, which was raised in *Fitzgerald*.

¶28 Central to *Fitzgerald* was the plain language of the 1971 divorce decree reading that "the defendant shall have no right to visit said child, unless and until, he pays to the plaintiff the sum of fifty dollars per month through the clerk of this court for the support and maintenance of the minor child of the parties hereto." *Fitzgerald*, 190 Mont. at 67, 618 P.2d at 867. Because the father actively avoided seeing the child for the next eight years, he then reasoned that he did not have to pay the support. This Court did not concur with his reasoning. Here, we have a father who has spent the better part of thirteen years actively attempting to establish relations with his son, as opposed to a pattern of avoidance. Neither do we concur with the State's assertion that this is a custody dispute like that in *Fitzgerald*. The record indicates that John has stated his belief that under the circumstances his son should remain with Cynthia. Nowhere in the record does it now appear that he is actively seeking custody of Neal.

¶29 It appears to this Court from the record that in each of the cases cited by the State, the absent father was attempting to exploit narrow legal technicalities to avoid undisputed court-ordered support obligations awarded at the time of dissolution, whereas here the father aggressively sought within and without the courts to provide a home for and generally maintain and establish a parent-child relationship with his son, only to be thwarted by his sister. In none of these cases was the ex-spouse or other custodian

explicitly seeking to exhaust the father's will and pecuniary resources to destroy the parent-child relationship. In this case, however, we conclude that the individual elements of equitable estoppel have been met, and we uphold the ruling of the District Court.

## Issue 2

¶30 Did the District Court err when it held the statutory rights of the State of Montana to be reimbursed for the payment of public benefits on behalf of a child were negated by the conduct of the child's legal guardian?

¶31 We review a district court's interpretation of the law to determine whether the court's interpretation of the law is correct. *Eddleman v. Aetna Life Ins. Co.*, 1998 MT 52, ¶ 8, 288 Mont. 50, ¶ 8, 955 P.2d 646, ¶ 8. We conclude here that the District Court did not err in its interpretation of the law. We agree with the District Court's conclusion that the statutory rights of the State to be reimbursed for the payment of public benefits are predicated upon the beneficiary actually having rights capable of being assigned to the State. The State's arguments concerning this statute are incomplete with regard to the other jurisdictions that have reviewed similar issues, as the State has not provided the actual statutory language of the other jurisdictions that were interpreted by the cases cited.

¶32 In *Comer v. Comer* (Cal. 1996), 927 P.2d 265, the father was subject to an existent court-ordered child support obligation established at the time of dissolution. The father made minimal, irregular payments over the years under his obligation. California's Family Code, § 4821, states that, "if a state or a political subdivision furnishes support to an individual obligee, it has the same right to initiate an action . . . as the individual obligee for the purpose of securing reimbursement for support furnished and of obtaining continuing support." *Comer*, 927 P.2d at 273. There, the right to support was established years earlier by the court in divorce proceedings and the State of California simply stepped into the shoes of the original obligee. We do not agree with the State of Montana's assertion that the State of California inherited rights greater than those set forth in either the divorce decree or California's statutes.

¶33 *County of San Diego v. Green* (Ariz. App. 1991), 810 P.2d 622, also cited by the State, is in the end much more supportive of the District Court's analysis of the instant case. While the Arizona appellate court did indeed make the statement set forth by the State, it did so in remanding the case for further proceedings on the Respondent's contention that no duty of support was owing under Arizona law. The case was cited by

the same court in *Arizona v. Perez* (Ariz. App. 1996), 931 P.2d 427, to support a laches defense against the State of Arizona when the State failed to timely seek support from the non-custodial parent under an assignment like we have here. The Arizona court noted, "application of laches under this, it is hoped, exceptional scenario does not unduly interfere with the State's ability to pursue support arrearages in other cases, nor does it detract from the strong public policy of promoting the welfare of children." *Perez*, 931 P.2d at 430. In referring to *Green*, the court stated, "[t]hat the State has a remedy unavailable to the custodial parent does not preclude a parent obligated to pay child support from asserting a viable laches defense against the State. Accordingly the trial court did not err in finding appellants' claim for child support arrearages barred." *Perez*, 931 P.2d at 430. We concur, noting that laches is also an equitable doctrine with similar factors to estoppel.

¶34 If the Montana Legislature had intended that the State would inherit an unequivocal right to collect from all parties at the time public assistance was granted, regardless of whether a court had approved an order of support, the language would differ greatly from the obviously discretionary language actually passed by the Legislature. Section 53-2-613, MCA, states in pertinent part:

> (2) A person who signs an application for FAIM financial assistance, as defined in 53-2-902, or related medical assistance assigns to the state, to the department, and to the county welfare department all rights that the applicant *may* have to monetary and medical support from any other person in the applicant's own behalf . . . . [Emphasis added.]

The District Court stated,

> John did not have an existing child support obligation that Cynthia assigned to CSED under subsection (5), instead CSED is trying to establish a new child support obligation. Subsection (2) assigns to the State all rights that an applicant *may* have to monetary support from any other person. [Emphasis added.]

Certainly not all recipients of public benefits have such assignable rights, and there were none here. The word "may" appears to reflect an awareness by the Legislature of this very principle. "If the statutory language is clear and unambiguous, the statute speaks for itself and there is nothing left for the Court to construe." *Montana Contractors' Assoc. v. Department of Hwys.* (1986), 220 Mont. 392, 394, 715 P.2d 1056, 1058. We will not use

this case to expand upon unambiguous statutory language. We conclude that the District Court did not abuse its discretion in interpreting the statutory language and that Cynthia had no rights to support capable of being conveyed to the State.

## CONCLUSION

¶35 As we said in *Rase*, where the issues are not close, the standard of review is to uphold the district court on questions of fact unless there is a decided preponderance of the evidence against its findings. Here, the ALJ's Findings of Fact as adopted by the District Court were not controverted by the State. As a result, there is little to no evidence against the Court's findings. Because the District Court's Findings of Fact are not clearly erroneous and there is no preponderance of evidence against them, we uphold them.

¶36 We have ruled that the elements of equitable estoppel and waiver have been met, based upon sound Findings of Fact by the ALJ and adopted by the lower court. As a result, we affirm the District Court's ruling and will not award child support in this matter under the current circumstances of custody. Should these circumstances change, this matter must be revisited.

¶37 With regard to the issue of whether the current guardian of the child could assign rights to the State that she did not have, we will not under these circumstances expand the regular meaning of the statutory language "may" and confer greater rights to the State than the guardian possessed.

¶38 Finally, we will not countenance subterfuge and failure to communicate among adults responsible for the upbringing of children. Those who act extrajudicially or unilaterally to their benefit in the short term will find rare solace in the long term. The individual and societal costs for such behavior are immeasurable.

¶39 We hold that the District Court was correct in ruling that John Stiles has no obligation to provide additional support to his natural son Neal while Neal remains in Cynthia's physical custody.

¶40 Affirmed.

/S/ J. A. TURNAGE

We concur:

/S/ JAMES C. NELSON

/S/ W. WILLIAM LEAPHART

/S/ TERRY N. TRIEWEILER

/S/ KARLA M. GRAY