FILED

March 2 2016

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 15-0301

DA 15-0301

IN THE SUPREME COURT OF THE STATE OF MONTANA

2016 MT 50

GLOBAL CLIENT SOLUTIONS, LLC,

        Third-Party Defendant and Appellant,

    v.

SUSAN M. OSSELLO,

        Defendant, Third-Party Plaintiff and Appellee.

APPEAL FROM:    District Court of the Second Judicial District,
                    In and For the County of Butte-Silver Bow, Cause No. DV-13-289
                    Honorable Kurt Krueger, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                Brendon J. Rohan, Emma R. Armstrong, Poore, Roth & Robinson,
                Butte, Montana

                Richard W. Epstein, Greenspoon Marder, P.A., Fort Lauderdale, Florida

        For Appellee:

                A. Clifford Edwards, Triel D. Culver, Edwards, Frickle & Culver,
                Billings, Montana

                              Submitted on Briefs:  November 18, 2015

                                    Decided:  March 2, 2016

Filed:

                           _____
                                  Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1      Global Client Solutions appeals from the District Court's order denying Global's motion to dismiss and to compel arbitration.  We affirm.

¶2      Global presents issues for review which we restate as follows:

Issue 1:  Whether the District Court erred in reserving to itself the determination of arbitrability.

Issue 2:   Whether the District Court erred in determining that the arbitration provision was unconscionable and therefore not enforceable against Ossello.

## BACKGROUND

¶3      In July 2012 Susan Ossello faced more than $40,000 in unsecured debt that she owed to Bank of America, Discover Bank and Citibank.  She received an unsolicited mailing from an entity called World Law, advertising that it could provide her with debt relief services.  The solicitation represented that World Law would furnish legal counsel concerning her debt issues; that it would negotiate with her creditors for a reduction of her debt; that it would prevent her from going into bankruptcy; and that under its plan she could be debt free in two to four years.  Ossello called a phone number provided in the mailing and talked to a sales agent for World Law.[1]

¶4      Ossello alleges that the agent represented that if she enrolled in the debt reduction program, World Law's attorneys would represent her and contact her creditors to

---

[1] This is an appeal from the denial of a motion to dismiss, so there is no factual record in this case.  The facts in this Opinion are taken primarily from the allegations of Ossello's complaint and the contents of Global's Dedicated Account Agreement, attached to Global's motion to dismiss.  Ossello's third-party complaint alleges that Global and World Law acted in concert and are jointly and severally liable for her claims.

negotiate reduced settlements of her credit card debts. The agent also told Ossello that these attorneys would represent Ossello if she got sued by a creditor. The agent then sent several form agreements to Ossello by email. She and the agent reviewed the forms over the phone, including a Client Services Agreement on behalf of World Law and a Dedicated Account Agreement on behalf of Global Client Solutions. The agent explained to her how to sign the agreements by entering her name into a box on the computer screen. Ossello electronically signed the agreements.

¶5 Global's Dedicated Account Agreement (DAA) established a non-interest-bearing account in an undisclosed bank, funded by an automatic monthly withdrawal of $589.29 from Ossello's existing bank account. The agent represented, and Ossello believed, that Global would use the proceeds in the account to pay her debts as they were negotiated and reduced. In reliance upon the advice of the agent and in a belief that she would benefit from a debt reduction plan, Ossello stopped making payments on her credit card debt. A year later, in September 2013, Discover Bank brought a collection action against her in Montana District Court.

¶6 Ossello contacted World Law or Global about the Discover Bank action. They sent her a form answer denying the material allegations of Discover Bank's complaint, and directed her to file it pro se. In November 2013 Ossello filed the form answer, which denied that she had ever applied for or received a credit card from Discover Bank; denied that she had any agreement with Discover Bank; and denied that she ever received monthly statements from Discover Bank. Ossello claims that World Law and Global

3

knew that the representations in the answer were not based in fact, and that they never provided her with any material legal services. Ossello contends that World Law and Global never contacted her creditors to obtain any debt reduction for her and that "no payments were ever made to [her] creditors from the Dedicated Account."

¶7     Ossello obtained an attorney and on June 18, 2014, filed an amended answer to Discover Bank's complaint, and a third-party complaint against World Law and Global. The complaint alleges that World Law and Global used deceptive and fraudulent representations to solicit her participation in an illegal debt settlement plan. Ossello alleges that World Law and Global misrepresented to her that attorneys were providing her with legal services, and deceptively promised to significantly reduce her debt without ever actually doing so. The counts of the complaint allege claims for violation of the Montana Consumer Debt Management Services Act; violation of the Montana Consumer Protection Act; fraudulent misrepresentation and deceit; negligent misrepresentation; illegality, unconscionability and contract of adhesion; unjust enrichment; unauthorized practice of law; and civil conspiracy.

¶8     World Law failed to appear and defaulted in August 2014. Global, however, filed a motion to compel arbitration and to dismiss the third-party complaint for lack of jurisdiction.

¶9     The Global Dedicated Account Agreement that Ossello received on her computer and signed by email stated that Ossello had "approved certain transactions to be taken in [her] account application." The DAA gave Global authority to disperse funds from the

4

account based on directions from Ossello or based on instructions from the "Sponsor as defined in [her] account application." The DAA gave Global the authority to act on the Sponsor's instructions "without further confirmation" from Ossello. The DAA authorized Global to deduct monthly fees and service charges from Ossello's money deposited into the account. Global could unilaterally increase those fees and charges "for any increase in the associated costs and expenses." Global also had the authority to transfer Ossello's account to another FDIC-insured institution, which was also not otherwise identified.

¶10    Attached to the DAA as Exhibit A was a single-page document entitled Dedicated Account Agreement and Application. That document provides that the "Dedicated Account" is to be administered at a bank selected by Global for the purpose of accumulating funds to "repay [Ossello's] debts in connection with a debt settlement program . . . sponsored by the organization identified below." That document further provides that only the applicant "(or Authorized Contact, if any) may authorize deposits to and creditor payments from my Dedicated Account." The "authorized contact" refers to the Sponsor, but the "World Law" entity is not listed in either document or identified as the "Sponsor." The application form has a line for the "Sponsor's" Global Account number but it is left blank, and in a box labeled "Sponsor" the term "Company Code" is listed.

¶11 The Global documents authorize "the Sponsor" to direct disbursement of funds from the account. However, nowhere is the Sponsor, the bank holding the account, or the account number identified.

¶12 The application also contains a schedule of fees and charges. That schedule lists an account maintenance fee of $9.45 and a wire deposit fee of $10.00 as the only monthly fees not related to "disbursement services." Ossello's complaint alleged that as of June 2014 Global had deducted $12,502.38 from her bank account and deposited the money into the account. She alleged at the time her third-party complaint was filed, that Global had taken $6567.90 from the account in fees but that she had received no debt relief or actual legal services. She also asserted that according to Global, the account then had a remaining balance of $5712.13.

¶13 The DAA also contained a lengthy arbitration clause. The clause requires arbitration of "any controversy, claim or dispute . . . arising out of or relating to" the Dedicated Account Agreement. The arbitration clause states that it applies to the "breach, termination, enforcement, interpretation or validity [of the Agreement], including the termination of the scope or applicability of this agreement to arbitrate." It provides that the arbitration would take place either in Oklahoma under the laws of that state, or in the state in which the consumer resides under the laws of that state. It provides that the arbitration would be "administered by the American Arbitration Association ("AAA") pursuant to its rules and procedures," before an arbitrator selected by the AAA. It also provides for sharing costs of the arbitration, with the customer's

share being limited to $2000. It explains that binding arbitration means that both parties give up the right to trial by jury, the right to appeal from the ruling in most instances, and the right to conduct extensive discovery.

¶14 The arbitration clause further provides that if a party fails to engage in arbitration, unsuccessfully challenges the award, or fails to comply with the award, the other party is "entitled to costs of suit, including a reasonable attorney's fee for having to compel arbitration or defend or enforce the award." Thereby, Global would be entitled to claim from Ossello all its attorney fees in the current case, if it were to prevail.

¶15 Significantly, though the DAA arbitration clause broadly requires both parties to arbitrate "any controversy, claim or dispute . . . relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof," Global reserved to itself in a separate paragraph of the DAA the right to bring "collection actions" in court against Ossello and require her to pay all costs and attorney fees related thereto. The DAA provides that if Ossello's bank account had a "negative balance" at any time, and Ossello failed to pay "upon demand," she was responsible for that deficit and "collection actions may be pursued against you. If any such collection action is undertaken, you agree to pay all court costs and collection fees, including reasonable attorney's fees to the extent permitted by applicable law." Therefore, if Ossello's bank account could not cover Global's periodic deductions for expenses, Global could sue her in a court of law to collect the deficit, along with its costs and attorney fees.

¶16 The District Court found that Ossello had directly challenged the arbitration clause in the Dedicated Account Agreement by specifically alleging in her third-party complaint that the Agreement was unconscionable and that it wrongfully waived her right to a jury trial.[2] Therefore, the District Court concluded that it had jurisdiction to determine the validity of the arbitration clause. The District Court then determined that under Montana law,[3] a challenged arbitration clause is treated "as a contract on equal footing with other contracts" and that unconscionability may be determined by inquiring whether the contract is one of adhesion and whether the contract unreasonably favors the drafter.

¶17 The District Court held, in part, that the arbitration clause in Global's contract was unconscionable and therefore unenforceable. The analysis employed by the District Court considered first whether the contract was a contract of adhesion, and secondly whether the contract unreasonably favored the drafter (Global), citing *Kelker v. Geneva-Roth Ventures*, 2013 MT 62, ¶ 59, 369 Mont. 254, 303 P.3d 777. The District Court summarized the contentions of each side regarding the terms of the arbitration agreement and determined that it was unconscionable. The District Court cited the context in which the agreement was presented to Ossello (in a phone call by a person who provided assurances that "attorneys" were involved or would be involved to handle everything for her); the fact that the entire transaction with the sales person on the phone

---

[2] Global concedes that Ossello properly raised a challenge to the validity of the arbitration clause.

[3] The arbitration clause in the Dedicated Account Agreement provides that the validity and enforceability of the Agreement and issues of arbitrability may be decided under the law of the consumer's state of residence.

consumed only about 15 minutes; that Ossello was not told that she had the right to ask for a change in any provision of the agreement; and that she was not told and did not know that she was agreeing to abide by a form of dispute resolution that required her to forego the right to seek relief in court.

¶18 The District Court determined that the Dedicated Account Agreement was a contract of adhesion because it was drafted by the stronger party and Ossello had only the choice of accepting it or rejecting it without specific negotiation. The District Court concluded that the arbitration clause was unconscionable and not enforceable, and it therefore denied Global's motion to dismiss and motion to compel arbitration. Global appeals.

## STANDARD OF REVIEW

¶19 This Court reviews a district court's decision on a motion to dismiss, de novo. *Estate of Big Spring,* 2011 MT 109, ¶ 20, 360 Mont. 370, 255 P.3d 121. This Court also reviews de novo a district court's order concerning a motion to compel arbitration. *Kelker,* ¶ 9. A motion to dismiss is considered in a light most favorable to the non-moving party and the factual allegations of the non-moving party are taken as true. *Kortum-Managhan v. Herbergers*, 2009 MT 79, ¶ 12, 349 Mont. 475, 204 P.3d 693.

## DISCUSSION

¶20 This case involves the intersection of federal and state laws concerning arbitration. The Federal Arbitration Act governs arbitration issues arising from transactions in interstate commerce. *Iwen v. U.S. West Direct*, 1999 MT 63, ¶ 23, 293 Mont. 512, 977

9

P.2d 989. The FAA was enacted in 1925 to quell "widespread judicial hostility to arbitration agreements." *A T & T Mobility v. Concepcion*, 563 U.S. 333, 339, 131 S. Ct. 1740, 1745 (2011). A primary purpose of the FAA is to ensure that arbitration agreements exist upon the "equal footing" as all other contractual provisions. *Buckeye Check Cashing v. Cardegna,* 546 U.S. 440, 443, 126 S. Ct. 1204, 1207 (2006). Under the FAA:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction or refusal, shall be valid, irrevocable and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. The final clause of the statute is often referred to as the "savings clause," the effect of which is that the FAA "does not require the enforcement of arbitration agreements" that would be subject to "generally applicable [state law] contract defenses such as fraud, duress, or unconscionability." *Mortensen v. Bresnan*, 722 F.3d 1151, 1158 (9th Cir. 2013). However, an arbitration agreement cannot be invalidated by state law defenses that "apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *Concepcion*, 563 U.S. at 339, 131 S. Ct. at 1746.

¶21 Montana law favors arbitration and the State has adopted the Uniform Arbitration Act, Title 27, chapter 5, MCA. Under Montana law, when parties agree to arbitrate disputes, a district court upon application must order them to proceed to arbitration. Section 27-5-115, MCA. There is a presumption of arbitrability and doubts should be

resolved in favor of arbitration. *Kalispell Education Assoc. v. Bd. of Trustees*, 2011 MT 154, ¶ 18, 361 Mont. 115, 255 P.3d 199.

¶22 The prevailing rule is that whether a particular dispute is subject to arbitration is a threshold issue to be decided by the courts unless the parties explicitly agree to assign that issue itself to arbitration. *Bridge Fund Capital v. Fastbucks*, 622 F.3d 996, 1000 (9th Cir. 2010). Where a party specifically challenges the validity of the arbitration clause, and not just the entire contract that contains it, then it is the court that determines the validity of the arbitration clause. *Buckeye*, 546 U.S. at 444, 126 S. Ct. at 2775.

¶23 The initial inquiry when any court is asked to compel arbitration is whether the parties have agreed to arbitrate. *Kalispell Education Assoc.*, ¶ 11. It is a "fundamental principle that arbitration is a matter of contract." *Concepcion*, 563 U.S. at 339, 131 S. Ct. at 1746, (citing *Rent-A-Center v. Jackson*, 561 U.S. 63, 130 S. Ct. 2772 (2010)). An enforceable agreement to arbitrate must therefore have the same elements as any contract: namely, identifiable parties with the capacity to contract; the consent of the parties; a lawful object; and consideration. Section 28-2-102, MCA; *Thornton v. Songstad*, 263 Mont. 390, 394, 868 P.2d 633, 635 (1994). The consent of the parties requires that there be "mutual assent or a meeting of the minds on all essential terms to form a binding contract." *Keesun Partners v. Ferdig Oil Co.*, 249 Mont. 331, 337, 816 P.2d 417, 421 (1991).

¶24 With these general principles of arbitration and contract law as a backdrop, we now turn to the issues before the Court.

¶25 *Issue 1: Whether the District Court erred in reserving to itself the determination of arbitrability.*

¶26 Global raises several arguments in support of its contention that the District Court did not have the authority to determine whether the present dispute was arbitrable. First, Global maintains that Ossello's claims must go directly to arbitration because she did not specifically challenge the validity of the arbitration clause as required by *Buckeye*. However, Global also concedes that Ossello challenged the arbitration clause in response to Global's motion to compel arbitration. This was sufficient to meet Ossello's obligation to challenge the arbitration clause. *Bridge Fund Capital*, 622 F.3d at 999.

¶27 Second, Global argues that its arbitration provision contains a "delegation term" that requires an arbitrator and not a court to decide any threshold issues of arbitrability. We begin with the fundamental principle under the FAA that it is the responsibility of the court and not the arbitrator to determine the threshold issue of arbitrability—i.e., the validity of a challenged arbitration clause. *Kelker*, ¶ 12; *Buckeye*, 546 U.S. at 444, 126 S. Ct. at 2775. However, the parties to an agreement to arbitrate may agree to a "delegation provision" that assigns to the arbitrator the determination of the initial issues of arbitrability. *Rent-A-Center*, 561 U.S. at 68, 130 S. Ct. at 2777. The Supreme Court has held that the terms of an enforceable delegation provision must be "clear and unmistakable" on the face of the arbitration agreement. *First Options v. Kaplan*, 514 U.S. 938, 944, 115 S. Ct. 1920, 1924 (1995). "Courts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e] evidence that they did so." *Rent-A-Center*, 561 U.S. at 68-69, 130 S. Ct. at 2778.

12

¶28    Global contends that the following language in its arbitration clause constitutes a delegation provision that must be enforced:

> In the event of any controversy, claim or dispute between the parties arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation, or validity thereof, including the *termination* of the scope or applicability of this Agreement to arbitrate, shall be determined by arbitration. . . . (Emphasis added.)[4]

Global maintains that this provision evidences Ossello's agreement to arbitrate arbitrability, preempting the rule of *Buckeye* and *Kelker* that enforceability of an arbitration provision is for a court to decide. We disagree.

¶29    There is no "clear and unmistakable" agreement in Global's language or elsewhere in the facts of this case to arbitrate questions of arbitrability. It is black-letter law that contract language should be interpreted most strongly against the party responsible for the language. Section 28-3-206, MCA; *West v. Club at Spanish Peaks*, 2008 MT 183, ¶ 53, 343 Mont. 434, 186 P.3d 1228. The fact that Global felt compelled to argue in its brief that the word "termination" in its delegation clause should actually be read as "*de*termination" underscores the lack of clarity in this provision. As written, the language is ambiguous and confusing. It does not clearly delegate to the arbitrator the determination of the scope or applicability of the agreement to arbitrate; rather it delegates to the arbitrator the "termination of the scope or applicability of this agreement to arbitrate." This language, written by Global, makes no sense and we are unable to

---

[4] In its brief, Global inserts the prefix "de" in front of the italicized "termination" in this language, contending that "determination" was the term intended. There is no "de" in the original language and we decline to allow Global to alter the language that it drafted to suit its purposes on appeal.

plainly construe its meaning. The purported delegation provision here therefore falls far short of the required *clear and unmistakable* standard adopted by the United States Supreme Court. This provision therefore cannot displace the prevailing rule that the validity of the arbitration clause is to be determined by the court. The District Court properly proceeded to determine the enforceability of the arbitration provision.

¶30 Global further argues that Ossello should be precluded from now contesting the enforceability of the delegation clause because she failed to contest it in the District Court. However, at the time that Ossello filed her brief in the District Court in opposition to Global's motion to compel arbitration, Global had not raised any argument with respect to a delegation provision. To the contrary, Global argued strenuously that the District Court should consider the arbitration requirement on its merits and order Ossello into arbitration. In other words, Global initially argued its position as if there were no delegation provision at issue in the case. It was only after Ossello filed her brief in opposition to Global's motion to compel arbitration that Global raised the delegation clause argument upon which it now relies. Under these circumstances, we will not conclude that Ossello waived her right to oppose the delegation clause.

¶31 Global next argues that reference in the arbitration clause to the "American Arbitration Association" constitutes a delegation provision. The arbitration clause in the DAA provides that the arbitration be "*administered* by the American Arbitration Association ("AAA") pursuant to its rules and procedures. . . . ." (Emphasis added.) Administration of the *conduct* of arbitration proceedings pursuant to AAA rules suggests

implementation of procedural and logistical rules; it declares nothing concerning delegation. There is no language in the arbitration clause that imposes a clearly-defined and unmistakable agreement to supplant the general rule that courts determine arbitrability.

¶32    Global alternatively argues that it is the "general rule" that incorporation of the AAA rules into an arbitration clause constitutes an agreement to arbitrate arbitrability. We cannot agree. The cases cited by Global almost exclusively involve arbitration disputes between sophisticated parties in commercial settings, not dealings between a debt relief organization and a debt-ridden consumer. *See, e.g., Oracle America v. Myriad Group*, 724 F.3d 1069 (9th Cir. 2013) (dispute between two computer software companies, in which the Court applied the "general rule" on AAA incorporation but "express[ed] no view as to the effect of incorporating arbitration rules into consumer contracts."). In the present case, the AAA rules are not part of the record and neither the DAA nor Global's arguments specify which of the multiple sets of commercial or consumer AAA rules are supposedly incorporated here. We cannot therefore conclude that Global's mere reference to administering an arbitration pursuant to AAA rules constitutes a substantive agreement with Ossello to forego the general rule that arbitrability is to be decided by the court.

¶33    For the foregoing reasons, we reject Global's argument that the District Court erred in reserving to itself the determination of whether the DAA was subject to

arbitration. We next turn to the merits of the enforceability of the arbitration clause against Ossello.

¶34 *Issue 2: Whether the District Court erred in determining that the arbitration provision was unconscionable and therefore not enforceable against Ossello.*

¶35 For the reasons set forth below, we conclude that Global's purported right to compel Ossello to arbitrate fails for the fundamental reason that it is unconscionable under Montana contract law. Under Montana law, a contract provision can be unconscionable and therefore unenforceable if "when considered in its context, [it] is unduly oppressive, unconscionable or against public policy." *Iwen*, ¶ 27.[5] Unconscionability in Montana contract law is a concept adapted from the Uniform Commercial Code, and requires a determination that the contractual term is unreasonably favorable to the drafter, and there is no meaningful choice on the part of the other party but to accept the provision.[6] *Iwen*, ¶ 32 (citing *Leibrand v. National Farmers Union*, 272 Mont. 1, 898 P.2d 1220 (1995)).

¶36 In *Iwen*, we addressed whether an arbitration clause contained in a contract for telephone book advertising was binding upon an attorney customer who filed a complaint

[5] *Iwen* also considered, alternatively, whether the disputed contract provision was within the reasonable expectations of the party attacking it. *Iwen*, ¶ 27. We expressly decide the present case without consideration of Ossello's reasonable expectations as to the DAA with Global. *See Mortensen*.

[6] Global concedes that the DAA is a contract of adhesion, although preferring to refer to it as a "standard form contract." Global contends that the law, evidently the FAA, is intended to protect contracts of adhesion because they are now common and essential to business. Montana law will not find an arbitration clause or any other provision unenforceable simply because it is in a contract of adhesion. *Day v. CTA, Inc.*, 2014 MT 119, ¶ 11, 375 Mont. 79, 324 P.3d 1205 (upholding an arbitration clause in a contract between a property owner and an architectural engineering firm).

against U.S. West for damages because his paid advertisement was incomplete and his telephone number and address were missing. *Iwen*, ¶ 7. The arbitration provision obligated the parties to arbitrate "any controversy or claim arising out of or relating to this agreement, or breach thereof," but provided that any action by the publisher (U.S. West) for the collection of amounts due under the agreement was exempted from the arbitration obligation. This Court found the arbitration clause unreasonably favorable to the drafter because it required the customer to arbitrate all controversies, but allowed the company to sue in a court of law to collect amounts due under the contract from the consumer. *Iwen*, ¶ 31. We concluded the arbitration provision lacked mutuality of obligation, was one-sided, and contained terms unreasonably favorable to the drafter. We said:

> Certainly, this does not mean arbitration agreements must contain mutual promises that give the parties identical rights and obligations, or that the parties must be bound in the exact same manner. This simply restates the rule of law that disparities in the rights of the contracting parties must not be so one-sided and unreasonably favorable to the drafter . . . that the agreement becomes unconscionable and oppressive.

*Iwen*, ¶ 32.

¶37 The arbitration provision at issue in this case similarly obligates both parties to arbitrate any controversy or dispute arising out of the DAA, including matters with respect to breach or enforcement of the agreement. *See* Opinion, ¶ 13. However, a separate provision in the DAA provides that if Ossello's account has a negative balance at any time, "collection actions may be pursued against you. If any such collection action is undertaken, you agree to pay all court costs and collection fees, including reasonable

17

attorney's fees, to the extent permitted by applicable law." Thus, as in *Iwen*, Ossello is obligated to arbitrate all controversies arising from the breach of the DAA, but if Ossello breaches the agreement, Global has the right to sue her in a court of law and to recover damages plus court costs, collection fees, and attorney fees. As we further observed in ¶ 31 of *Iwen*, as a practical matter, the only reason that U.S. West would seek a remedy against Iwen would be for an unpaid bill, and for that purpose it had free reign to seek a remedy before a court of law, while Iwen would be forced to seek any and all remedies against U.S. West in arbitration. The same is true here. Global is entitled to sue Ossello in a court of law for breach of the agreement, but she cannot sue it for breach of the agreement. In sum, the obligation to arbitrate is one-sided, not mutual.

¶38 We are mindful that *Iwen* pre-dates *Concepcion* and *Mortensen*. In *Concepcion*, the Supreme Court concluded that a California state law rule that deemed unconscionable class-action waivers in consumer contracts of adhesion was preempted by the FAA because it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Concepcion*, 563 U.S. at 352, 131 S. Ct. at 1753 (internal citations omitted). In *Mortensen,* the Ninth Circuit interpreted *Concepcion* to mean that "[a]ny general state-law contract defense, based in unconscionability or otherwise, that has a disproportionate effect on arbitration is displaced by the FAA." *Mortensen*, 722 F.3d at 1159. Based upon *Concepcion* and *Mortensen*, Global maintains here that any generally applicable state rule that stands as an obstacle to the objectives of the FAA is preempted by the Act. We do not agree with this broad statement.

18

¶39    Notably, several state and federal courts since *Concepcion* have concluded that lack of mutuality of obligation in an arbitration clause remains an appropriate basis for considering the enforceability of an arbitration clause. *See Figueroa v. THI of N.M. at Casa Arena Blanca, LLC,* 306 P.3d 480 (N.M. App. 2013) (holding that notwithstanding the pronouncements in *Concepcion,* an arbitration agreement in which the drafter unreasonably reserved to itself the claims it would most likely bring for the courts while subjecting the weaker party to arbitration of all claims, was unenforceable) (*cert. denied by THI of New Mexico at Casa Arena Blanca, LLC v. Figueroa,* 133 S. Ct. 2736 (2013)); *Brewer v. Mo. Title Loans*, 364 S.W.3d 486 (Mo. 2012) (concluding *inter alia* that *Concepcion* does not bar a finding that an arbitration clause is unenforceable where a title company reserves its right to obtain its primary remedies through the court system, but requires the party with lesser bargaining power to obtain her only meaningful remedy through individual arbitration) (*cert. denied by Mo. Title Loans*, *Inc. v. Brewer*, 133 S. Ct. 191 (2012)); *Noohi v. Toll Bros.*, 708 F.3d 599 (4th Cir. 2013) (affirming district court ruling that an arbitration provision was unenforceable for lack mutuality of consideration because it bound only the purchaser to arbitration) (*cert. dismissed by Toll Bros. v. Noohi*, 134 S. Ct. 48 (2013)); *Lou v. MA Labs., Inc*., 2013 U.S. Dist. LEXIS 70665 (N.D. Cal. 2013) (concluding that the lack of mutuality in an arbitration provision renders the clause unconscionable and therefore unenforceable). The fact that the United States Supreme Court has denied certiorari in three of the foregoing cases illustrates that *Concepcion* has

19

not wholly preempted an unconscionability defense premised upon a lack of mutuality of obligation in actions in which an arbitration clause is challenged.

¶40 As noted, the District Court found *inter alia* that the arbitration clause in Global's contract was unconscionable because it unfairly favored the drafter. We agree. This is the same conclusion underpinning our analysis in *Iwen.* We conclude that the District Court's finding of unfavorable treatment and unconscionability was correct because the arbitration clause lacked mutuality. As was the case in *Iwen*, Global retained in the DAA important rights not provided to Ossello. Global had the right to sue Ossello in a court of law at any time the Dedicated Account lacked funds to cover Global's payment demands or withdrawals. Because virtually the only breach of contract with which Global would be concerned would be lack of payment, Global reserved to itself the right to litigate its primary claim while requiring Ossello to arbitrate any and all claims she might have under the DAA. This arbitration provision unreasonably favors Global to the detriment of Ossello and is therefore unconscionable and unenforceable.

¶41 *Concepcion* and *Mortensen* cautioned against courts invoking state law defenses to upend an otherwise valid arbitration clause. That is not what has occurred here. This arbitration clause is invalid not due to a disproportionate application of state law, but rather because Global—like the drafters in the cases noted above—chose to compel arbitration for Ossello while reserving to itself the right to pursue its remedies in a court of law. Such one-sided arbitration clauses do not serve the objectives of the FAA.

20

¶42    For the foregoing reasons, we conclude that the District Court did not err in reserving to itself the determination of arbitrability, nor did it err in declaring that the arbitration provision is unconscionable and therefore not enforceable against Ossello.

¶43    Affirmed.

/S/ MIKE McGRATH

We Concur:

/S/ PATRICIA COTTER
/S/ MICHAEL E WHEAT
/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER

Justice Michael E Wheat, concurring.

¶44    I concur with the majority to affirm the District Court's decision that the arbitration clause in Global's purported contract was unenforceable against Ossello.  I take this opportunity to expand upon the state of the law under the Federal Arbitration Act and the extremely narrow tight rope that state courts are forced to walk when attempting to apply existing state law to cases before them.  The issue is long past whether there is a contract of adhesion.  Most citizens now regularly participate in contracts of adhesion to provide themselves with goods and services that at least seem to be essential to modern life.

¶45    The elephant in the room is not state hostility toward arbitration.  As noted in the majority opinion, Montana has a state arbitration act and Montana courts will uphold and

enforce an arbitration requirement when the parties have agreed to it. *Kalispell Education Assoc.*, ¶ 22. If there is any hostility, it is toward those who hide behind the FAA, and behind the court decisions interpreting it, to escape any material consequence of running fraudulent confidence schemes. In the present case, if Ossello proves the material allegations of her complaint, it is clear that she was induced into a fraudulent scheme to take $589.29 from her every month, but to provide little or nothing in return.

¶46 Under the interpretation urged by the Dissent, Ossello would be required to pay up to $2000 to participate in arbitration, while at the same time she would presumably be precluded from raising any of the claims against World Law and Global that she alleges in her complaint. Those claims include fraudulent and negligent misrepresentation, violations of the Montana Consumer Protection Act, violations of the Montana Consumer Debt Management Services Act, unjust enrichment, and the unauthorized practice of law.

¶47 More significantly, within the arbitration process Ossello would be placed in the untenable and inconsistent position of acknowledging that the arbitration provision is binding and valid, but that the contract that includes it is not enforceable because it was induced by fraud and deceit.

¶48 In the face of schemes like this, state courts are told that they cannot consider the merits of the situation; that arbitration clauses are inherently severable from the underlying purported contract; that the victim of the fraud must mount a separate challenge against the arbitration clause itself; that the victim of the fraud must mount a separate challenge to the delegation provision in the arbitration clause; and that a

challenge to the arbitration clause must stand or fall upon grounds unique to that clause. State courts are told that they may not determine that there was a unified fraudulent scheme to victimize a consumer, but that they may only consider the arbitration clause in artificial isolation. Further, state courts are told that if they decide too many cases against those who hide behind fraudulently-induced arbitration clauses, their state law will be ignored as being hostile to arbitration. Here, for example, if Ossello proves the material allegations of her complaint, there was a scheme to fraudulently induce here to hand over money to Global every month.

¶49 As the majority opinion properly notes, arbitration is a matter of contract law, and the FAA was enacted to place arbitration on the same footing as all other contractual provisions. Under the express and simple terms of 9 U.S.C. § 2, arbitration clauses are enforceable "save upon such grounds as exist at law or in equity for the revocation of any contract." Supposedly, because agreements to arbitrate are contracts, the initial inquiry should be whether the parties have entered a contract to arbitrate. That issue is or should be determined under basic hornbook contract law—identifiable parties with the capacity to contract, their consent to the contract, a lawful object, and consideration. It should go without saying that purported assent to a contract which is induced by fraud is no assent and therefore there can be no contract. But, a state court that so concludes under 9 U.S.C. § 2 risks having the conclusion vacated as evidencing a hostility toward arbitration.

¶50 The plain language of the FAA exception to enforceability of arbitration clauses, "save upon such grounds as exist at law or in equity for the revocation of any contract," is

23

rendered meaningless under the approach cited by the Dissent. Surely Congress, in enacting the FAA, did not intend to enable con men and charlatans to place themselves and their fraudulent schemes out of the reach of our courts simply by inserting arbitration language or a "delegation" clause into an otherwise fraudulent contract.

¶51　I concur.

/S/ MICHAEL E WHEAT

Chief Justice Mike McGrath and Justice James Jeremiah Shea join the Concurrence of Justice Michael E Wheat.

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA

Justice Laurie McKinnon, dissenting.

¶52　In my opinion, this case is controlled by *Rent-A-Center, West, Inc., v. Jackson*, 561 U.S. 63, 130 S. Ct. 2772 (2010), and the requirement that a delegation provision contained within an arbitration clause must be specifically challenged as unenforceable. I would further conclude that the specific language of the delegation provision and the DDA's incorporation of the AAA rules provide "clear and unmistakable" evidence that the question of arbitrability was to be decided by an arbitrator. Finally, while non-mutuality is a defense under state law to a contract, not every degree of non-mutuality renders an agreement unconscionable and unenforceable. Under the

24

provisions of this agreement, I would conclude that the non-mutuality of remedies, if any, did not render the arbitration agreement unenforceable.

¶53    Ossello has not made any challenge to the enforceability of the delegation term that is different from her challenge to the arbitration clause in general. Although Ossello acknowledged Global had moved to compel arbitration and that Global requested "the arbitrator (and not this Court) should decide the arbitration clause is enforceable," she failed to challenge the delegation clause specifically arguing instead that "she cannot be required to arbitrate anything, not even arbitrability, until a court has made a threshold determination that the parties did, in fact, agree to arbitrate." Ossello fails to recognize that while the threshold question of arbitrability is for the court to decide, the parties, as they did here, may agree to delegate resolution of that controversy to an arbitrator. Accordingly, "unless [Ossello] challenged the delegation provision specifically, [this Court] must treat it as valid under § 2 [of the Federal Arbitration Act], and must enforce it under §§ 3 and 4, leaving any challenge to the validity of the Agreement as a whole for the arbitrator."[1,2,3] *Rent-A-Center*, 561 U.S. at 72, 130 S. Ct. at 2779.

---

[1] 9 U.S.C. § 2, the "primary substantive provision of the Act," *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S. Ct. 927, 941 (1983), provides:
> A written provision  in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

[2] Under 9 U.S.C. § 3, a party may apply to a federal court for a stay of the trial of an action upon "any issue referable to arbitration . . . ."

[3] Under 9 U.S.C. § 4, a party "aggrieved" by the failure of another party to arbitrate may petition a federal court for an order directing that arbitration proceed. Section 4 reads, in part:

¶54    The delegation provision is an agreement to arbitrate threshold issues concerning the arbitration agreement.  The United States Supreme Court has recognized that "parties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Rent-A-Center*, 561 U.S. at 67, 130 S. Ct. at 2777.  The Court explained that because § 2 states that a "written provision" "to settle by arbitration a controversy" is "valid, irrevocable, and enforceable" without mention of the validity of the contract in which it is contained, a party's challenge to another provision of the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate.  *Rent-A-Center*, 561 U.S. at 69, 130 S. Ct. at 2778.  Thus, as a matter of "substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract." *Buckeye*, 546 U.S. at 445, 126 S. Ct. at 1209.  If a specific challenge is not made to the delegation clause, then it must be treated as valid under § 2.

¶55    The Court's severability analysis in *Rent-A-Center* stems from its earlier decision in *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 87 S. Ct. 1801 (1967), in which the Court held that consideration of a contract revocation defense is generally a matter for the arbitrator, unless the defense is specifically directed to the arbitration clause.  *Prima Paint*, 388 U.S. at 404, 87 S. Ct. at 1806.  In *Prima Paint*, the Court

> The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. . . . If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof.

addressed "whether a claim of fraud in the inducement of the entire contract is to be resolved by the federal court, or whether the matter is to be referred to the arbitrators." *Prima Paint*, 388 U.S. at 402, 87 S. Ct. at 1805. Guided by § 4 of the FAA, the Court held that "if the claim is fraud in the inducement of the arbitration clause itself—an issue which goes to the 'making' of the agreement to arbitrate—the federal court may proceed to adjudicate it." *Prima Paint*, 388 U.S. at 402, 87 S. Ct. at 1806. However, consistent with the principle of the FAA that arbitration is a matter of contract, the parties may agree to have the arbitrator decide arbitrability. Thus, in *Rent-A-Center*, the Court extended its *Prima Paint* severability analysis and recognized that a delegation of arbitrability is severable from the contract itself and, as a separate and independent provision of the agreement, must be specifically challenged as unenforceable.

¶56    The Court has treated the holding in *Prima Paint* as a rule of severability: when a party challenges a contract, but not specifically the agreement to arbitrate, the agreement to arbitrate is enforceable apart from the contract. Justice Stevens noted in his dissent in *Rent-A-Center* that "*Prima Paint* and its progeny allow a court to pluck from a potentially invalid *contract* a potentially valid *arbitration agreement*." *Rent-A-Center*, 561 U.S. at 85, 130 S. Ct. at 2786 (Stevens, J., dissenting) (emphasis in original). *Rent-A-Center* thus added a "new layer" of severability: courts must now sever from a potentially invalid agreement an even narrower provision that refers particular arbitrability disputes to an arbitrator. This new layer of severability is consistent with the principle that "[a]n agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the

27

party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other." *Rent-A-Center*, 561 U.S. at 70, 130 S. Ct. at 2777-78. When an arbitration agreement contains a delegation provision and the plaintiff raises a challenge to the contract as a whole, the federal courts may not review his claim because it has been committed to the power of the arbitrator. Instead, the plaintiff must "challenge[ ] the delegation provision *specifically*." *Rent-A-Center*, 561 U.S. at 72, 130 S. Ct. at 2779 (emphasis added).[4]

¶57 The challenge Ossello makes is indistinguishable from the challenge made by Jackson and found to be insufficient in *Rent-A-Center*. Jackson opposed the motion to compel filed by Rent-A-Center on the ground that "the arbitration agreement in question is clearly unenforceable in that it is unconscionable," *Rent-A-Center*, 561 U.S. at 66, 130 S. Ct. at 2775; that "the entire arbitration agreement, *including the delegation clause*, was unconscionable," *Rent-A-Center*, 561 U.S. at 73, 130 S. Ct. at 2779 (emphasis added);

---

[4]The Court in *Rent-A-Center* was careful to note that application of the severability rule was required regardless of whether the underlying contract was itself an arbitration agreement. The Court, appearing to respond to the dissent, stated:

> To be sure this case differs from *Prima Paint*, *Buckeye*, and *Preston*, in that the arbitration provisions sought to be enforced in those cases were contained in contracts unrelated to arbitration—contracts for consulting services, see *Prima Paint*, check-cashing services, see *Buckeye*, and "personal management" or "talent agent" services, see *Preston*. In this case, the underlying contract is itself an arbitration agreement. But that makes no difference. Application of the severability rule does not depend on the substance of the remainder of the contract. Section 2 operates on the specific "written provision" to "settle by arbitration a controversy" that the party seeks to enforce. Accordingly, unless Jackson challenged the delegation provision specifically, we must treat it as valid under § 2, and must enforce it under §§ 3 and 4, leaving any challenge to the validity of the Agreement as a whole for the arbitrator.

*Rent-A-Center*, 561 U.S. at 71-72, 130 S. Ct. at 2779 (internal citations omitted).

28

and that "the arbitration agreement as a whole is substantively unconscionable." *Rent-A-Center*, 561 U.S. at 73, 130 S. Ct. at 2779.

¶58 Because Jackson's opposition only challenged the arbitration agreement as a whole and "none of Jackson's substantive unconscionability challenges was specific to the delegation provision," the Court found it unnecessary to consider Jackson's claim and enforced the agreement as § 2 of the FAA required. *Rent-A-Center*, 561 U.S. at 73, 130 S. Ct. at 2780. *See also Brennan v. Opus Bank*, 796 F.3d 1125 (9th Cir. 2015); *Parnell v. Cashcall, Inc.*, 804 F.3d 1142 (11th Cir. 2015).

¶59 Ossello makes the same mistake made by the plaintiff in *Buckeye* and *Rent-A-Center*. She argues only that the DDA as a whole is illegal, without any argument specifically that the delegation clause is unenforceable. Jackson made a similar argument which was adopted by the Ninth Circuit Court of Appeals: "a party [who] challenges an arbitration agreement as unconscionable, and thus asserts that he could not meaningfully assent to the agreement, [leaves] the threshold question of unconscionability . . . for the court." *Rent-A-Center*, 561 U.S. at 67, 130 S. Ct. at 2776.

¶60 However, the Supreme Court considered this argument in *Rent-A-Center* and specifically rejected it. Accordingly, this Court's conclusion that Ossello challenged the arbitration clause itself and thus necessarily challenged the delegation provision, Opinion, ¶ 26, is in direct conflict with *Rent-A-Center*.

¶61 Although I would find that § 2 requires that the delegation clause be enforced because it has not been specifically challenged, I would nonetheless conclude that there is

29

"clear and unmistakable" evidence that the parties agreed to submit the question of arbitrability to an arbitrator. The disputed arbitration clause provides:

> In the event of any controversy, claim or dispute between the parties arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation, or validity thereof, including the termination of the scope or applicability of this Agreement to arbitrate, shall be determined by arbitration.

¶62 At Ossello's urging, the Court has found an ambiguity because "termination" appears out of place. Global argued there was a clerical error and that it should have read "determination." Regardless of whether the phrase is "termination" or should be "determination," the language remains clear and unmistakable—the "enforcement," "interpretation," "validity," and "the scope or applicability of [the] Agreement to arbitrate" shall be determined by arbitration. Any conclusion to the contrary is unsupportable and an attempt to manufacture an ambiguity. This is an express delegation clause which constitutes clear and unmistakable evidence that the parties agreed to submit the question of arbitrability to an arbitrator.

¶63 Additionally, the DDA provides that the "parties agree, the arbitration shall be administered by the American Arbitration Association pursuant to its rules and procedures . . . ." The Commercial Arbitration Rules and Mediation Procedures provide at R-7 that the "arbitrator shall have the power to rule on his or her own jurisdiction, including objections with respect to the existence, scope or validity of the arbitration agreement."[5] Thus, even in the absence of an express delegation clause, the

---

[5] The rule was amended in October of 2013, without any change in substance, and is now codified as R-14.

incorporation of the AAA rules operates as a delegation to an arbitrator of the question of arbitrability. While the Court dismisses Global's argument that the AAA rules were incorporated into the DDA on the basis that Global did not make them a part of the record, Global has provided the Court with a reference cite to the current AAA Consumer Arbitration Rules and Mediation Procedures and specifically quoted for the Court the relevant portion of R-7 regarding jurisdiction of the arbitrator.[6] The content of the rules does not appear to be in dispute and may be readily confirmed by visiting the reference cite provided by Global, as many courts have routinely done under similar circumstances. *See*, *e.g.*, *Terminix Int'l Co LP v. Palmer Ranch LtD P'Ship*, 432 F.3d 1327, 1332 (11th Cir. 2005) (citing www.adr.org as the source in identifying and quoting specific AAA rules incorporated into the parties' arbitration agreement for purposes of ascertaining whether parties had clearly and unmistakably agreed that the arbitrator should decide validity of arbitration clause).

¶64    Where an arbitration agreement incorporates rules conferring authority upon an arbitrator to decide gateway questions, courts have found clear and unmistakable evidence that the parties have contracted around the default rule that the court (rather than an arbitrator) must adjudicate objections to the validity of the arbitration agreement. *See U.S. Nutraceuticals, LLC v. Cyanotech Corp.*, 769 F.3d 1308, 1311 (11th Cir. 2014) ("When the parties incorporated into the 2007 contract the rules of the Association, they clearly and unmistakably contracted to submit questions of arbitrability to an

---

[6] Global's reference cite to the current AAA Consumer Arbitration rules is at p. 39 of their Opening Brief; Global sets forth R-7 at p. 15 of their Opening Brief.

arbitrator."). *See also Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2012) ("We agree with most of our sister circuits that the express adoption of [AAA rules into an arbitration agreement] presents clear and unmistakable evidence that the parties agreed to arbitrate arbitrability."); *Terminix Int'l Co LP v. Palmer Ranch LtD P'Ship*, 432 F.3d 1327, 1332-33 (11th Cir. 2005) ("By incorporating the AAA Rules, including Rule 8, into their agreement, the parties clearly and unmistakably agreed that the arbitrator should decide whether the arbitration clause is valid. . . . In the ordinary case, we would decide these questions only because they go to the validity of the arbitration clause itself, which is by default an issue for the court, not the arbitrator. Here, however, the parties have contracted around that default rule . . . ."); *Southland Health Services, Inc. v. Bank of Vernon*, 887 F. Supp. 2d 1158, 1167 (N.D. Ala. 2012) ("The arbitration agreements here clearly demonstrate the parties' intent to empower the arbitrator with the authority to determine his own jurisdiction. Each agreement states that it is subject to the rules of the AAA. . . . Because the agreements empower the arbitrator to determine jurisdiction, this Court is bound by its obligation to rigorously enforce agreements to arbitrate.") (citation and internal quotation marks omitted); *Knowles v. Community Loans of America, Inc.*, 2012 U.S. Dist. LEXIS 165321, at *5 (S.D. Ala. Nov. 20, 2012) ("One way to show a clear and unmistakable intent to arbitrate arbitrability is by agreeing that the arbitration will be conducted in accordance with formalized arbitration rules, which rules provide for arbitration of arbitrability.").

¶65    In *Oracle America, Inc. v. Myriad Group A.G.*, 724 F.3d 1069 (9th Cir. 2013), the Ninth Circuit observed, consistent with the above authority, that "[v]irtually every circuit to have considered the issue has determined that incorporation of the [AAA] arbitration rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." *Oracle*, 724 F.3d at 1074. The court found this consensus persuasive in holding that incorporation of the UNCITRAL rules—which contain a jurisdictional provision "almost identical" to the one in the AAA rules—constituted "clear and unmistakable evidence that the parties agreed the arbitrator would decide arbitrability." *Oracle*, 724 F.3d at 1074-75. When the question regarding incorporation of the AAA rules arose again in *Brennan v. Opus Bank*, 796 F.3d 1125 (9th Cir. 2015), the court clearly and unambiguously stated: "we hold that incorporation of the AAA rules constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability." *Brennan*, 796 F.3d at 1130.

¶66    Accordingly, the Court cannot reach any of the arguments regarding mutuality or unconscionability if the DDA reflects the parties' clear and unmistakable intent to have the arbitrator decide threshold disputes concerning such gateway matters as validity and arbitrability. Global has made a compelling showing that the parties clearly and unmistakably intended to arbitrate the question of arbitrability, both through the text of the delegation clause itself and the express incorporation of the AAA rules empowering the arbitrator to rule on his or her own jurisdiction. The relevant authorities (including

33

*Brennan*, *Oracle*, *Terminix* and its progeny) have consistently and rigorously enforced such provisions—which is precisely what this Court should do as well.

¶67 Finally, the Court has chosen an alternative route to find that the arbitration clause is unenforceable, concluding the remedies are non-mutual and "[s]uch one-sided arbitration clauses do not serve the objectives of the FAA." Opinion, ¶ 41. In electing this alternative route, the Court has avoided the issue primarily raised by the parties— whether Montana's "reasonable expectations/fundamental rights" rule, first enunciated in *Kortum-Managhan v. Herbergers NBGL*, 2009 MT 79, 349 Mont. 475, 204 P.3d 693, disproportionally impacts arbitration agreements and is consequently preempted by the FAA under the reasoning of *Concepcion*. *See Mortenson v. Bresnan Commc'ns LLC*, 722 F.3d 1151, 1161 (9th Cir. 2013). I would conclude that Montana's reasonable expectations/fundamental rights rule *is* contrary to the FAA as interpreted by *Concepcion* and conclusively answer that question for litigants and the trial courts.

¶68 Regarding the Court's alternative pursuit of unenforceability, a lack of mutuality of remedies in a contract is a type of "one-sidedness" that is likely peculiar to arbitration agreements. Thus, care must be taken to consider the admonition in *Concepcion* that, under the doctrine of preemption, state courts cannot adopt "defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *Concepcion*, 563 U.S. at 339, 131 S. Ct. at 1746. Unconscionability frequently includes a one-sided contract. Therefore, a court must consider all of the circumstances

of the particular agreement and refrain from adopting an automatic rule that non-mutuality of remedies renders an arbitration agreement unenforceable.

¶69    The Court finds that the remedies are non-mutual because of the following provision contained within the DDA:

> Default and Collection of Accounts:  If your Account is suspended, cancelled or otherwise terminated for any reason and your Account has a negative balance, you agree to pay the negative balance upon demand, Should you fail to remit the full amount of such negative balance, you shall remain responsible for the deficit and collection actions may be pursued against you.  If any such collection action is undertaken, you agree to pay all court costs and collection fees, including reasonable attorney's fees, to the extent permitted by applicable law.

Contrary to the Court's reasoning and conclusion, this provision does not give Global the right to bypass arbitration.  Arbitration is a matter of contract and when construing a contract we must consider the entirety of the agreement.  In addition to the provision relating to default and collection, the DDA provides any "controversy," "claim," or "dispute" arising out of the DDA must be submitted to arbitration.  These several provisions taken together and construed consistently, in the context of the entire agreement, lead to the conclusion that the default and collection provision concern the execution of the arbitration award following arbitration of any dispute.  Furthermore, a review of the DDA demonstrates that the Court's attempt to "carve out" a non-mutual remedy is misplaced: all disputes are to be submitted to arbitration; arbitration applies equally to Ossello and Global; arbitration is to occur in the county in which Ossello resides; the arbitrator must be neutral and independent; the arbitrator must abide by ethical codes; the arbitration must proceed before a national arbitration forum; both

parties give up their right to appeal; and the parties share equally the cost of arbitration, unless Ossello's costs exceed $2,000—in which case Global will pay the excess.

¶70    Considering the DDA in its entirety, I cannot agree with the Court that the non-mutual remedies, to the extent they may even exist, renders this arbitration agreement unenforceable.    Indeed, the Court's focus on complete mutuality and one-sidedness will likely disproportionately affect arbitration agreements in violation of *Concepcion*.  *Concepcion* makes clear that state courts may apply state common law defenses, to the extent they do not disproportionately affect arbitration agreements.  Here, I cannot find that mutuality is so lacking that it necessarily indicates substantive unconscionability; nor is the DDA so lacking in fairness, due to blatant one-sidedness, that it cannot escape being unconscionable.

¶71    I would conclude that Ossello has failed to specifically challenge the delegation provision and that § 2 of the FAA requires that an arbitrator decide the question of arbitrability.  Nonetheless, the language of the arbitration clause and the incorporation into the DDA of the AAA rules are clear and unmistakable evidence of the parties' intent to submit the question of arbitrability to an arbitrator.  Finally, I do not agree that this arbitration agreement is unenforceable because it is one-sided and lacking in mutuality. No matter what state law infirmity Ossello raises, whether the arbitration agreement fails for lack of mutuality in remedies, lack of consideration, failure of consideration, fraud in the inducement, unconscionability, or being declared fraudulent and void because Global was not a licensed debt settlement provider, the Supreme Court has held—clearly and

repeatedly—that such an infirmity is irrelevant to enforceability. Only a discrete challenge directed specifically at the delegation provision itself and a showing that it is invalid under generally applicable state laws—which do not disproportionately affect arbitration agreements—will render the agreement unenforceable.

¶72 I would reverse the District Court's judgment denying Global's motion to compel arbitration and allow an arbitrator to decide the question of arbitrability. To the extent we conclude otherwise, I dissent.

/S/ LAURIE McKINNON

Justice Jim Rice joins in the dissenting Opinion of Justice McKinnon.

/S/ JIM RICE